**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOPICNIC BRANDS, INC., | ) | Hon. Jacqueline P. Cox |
| | ) | |
| Debtor. | ) | Case No. 14-43382 |

## DEBTOR'S APPLICATION TO SET HEARING ON EMERGENCY MOTIONS

Pursuant to Amended General Order No. 12-01 of the United States Bankruptcy Court for the Northern District of Illinois, GoPicnic Brands, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), submits this application (the "Application") to set an emergency hearing on the morning of December 5, 2014, on its First Day Motions (as defined herein). In support of this Application, the Debtor respectfully states as follows:

### Background

1. On December 3, 2014 (the "Petition Date"), the Debtor filed a voluntary petition in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), thereby commencing the above-captioned case (the "Case"). The Debtor continues to manage and operate its businesses as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. The Debtor is an operating Chicago-based company that produces and markets nutritionally balanced and portable ready-to-eat breakfast, lunch and snacks. Additional information about the Debtor's background, equity and debt structure and the events that precipitated this bankruptcy filing is set forth in the First Day Motions.

4.      The Debtor seeks certain emergency relief pursuant to its "first-day" motions (the "First Day Motions"), specifically:

   a.   Debtor's Emergency Motion for Order Under 11 U.S.C. §§ 345 and 363 Authorizing (I) Continued Use of Existing Business Forms and Records and (II) Maintenance of Existing Corporate Bank Accounts and Cash Management System (the "Cash Management Motion");

   b.   Debtor's Emergency Motion for Order Pursuant to 11 U.S.C. §§ 507 and 363 (A) Authorizing, but not Directing, Payment of Prepetition Priority Salaries, Commissions and Employee Benefits and Continuation of Employee Benefit Plans and Programs Postpetition, (B) Authorizing, but not Directing, Deductions from Employees' Paychecks, and (C) Directing All Banks to Honor Prepetition Employee Obligations (the "Wage Motion"); and

   c.   Debtor's Emergency Motion for Authority to (1) Use Cash Collateral and (2) Provide Adequate Protection, and for Related Relief (the "Cash Collateral Motion").

The First Day Motions are attached hereto as Group Exhibit A.

**Emergency Nature of Relief Requested**

5.      The Debtor is operating its business in the ordinary course and plans to continue operating throughout this bankruptcy case.  It is critical to the Debtor's reorganization effort that it preserve its going concern value.  The First Day Motions request emergency relief related to this end.  The First Day Motions and bankruptcy petition could not be filed earlier, because the Debtor was diligently exploring various avenues to address its short-term liquidity needs and the circumstances of the case prevented the Debtor from knowing sooner that it would have to file the bankruptcy petition on the Petition Date.

6.      ***The Cash Collateral Motion.***  By the Cash Collateral Motion, the Debtor requests entry of an order authorizing the Debtor to: (i) use cash collateral on an interim basis and after a final hearing ("Final Hearing") on an extended basis to the extent necessary to operate the Debtor's business as a going concern and thereby maintain and preserve the Debtor's assets, and (ii) provide

adequate protection to the Debtor's secured creditors, Wells Fargo Bank, National Association, Partnership Capital Growth Investors III, L.P., and Clif White Road Investments, LLC (collectively, the "Lenders").  Without this relief, the Debtor will be unable to use its cash and forced to cease operations, thereby seriously jeopardizing the Debtor's ability to continue business operations and to maintain and preserve the ongoing concern value of its assets pending a capital raise or sale.  The Debtor thus respectfully submits that the relief requested is of an emergency nature.

7.     ***The Wage Motion.***  By the Wage Motion, the Debtor requests authority to pay employee-related prepetition priority obligations and to continue making certain tax and related deductions from employees' paychecks, as well as related relief.  It is critical to the Debtor's reorganization effort that the Debtor obtain immediate authority to pay its employees, because the Debtor requires their continued service and dedication to preserve its ongoing concern value as it continues to operate during this Case.  Without the assurance of payment, the employees may terminate their relationship with the Debtor and jeopardize the Debtor's business and the value of its assets.  The Debtor thus respectfully submits that the relief requested is of an emergency nature.

8.     ***The Cash Management Motion.***  By the Cash Management Motion, the Debtor requests entry of an order relieving it from complying with certain guidelines of the United States Trustee governing the Debtor's bank accounts and cash management system.  It would be extremely difficult—if not impossible—for the Debtor to comply with the United States Trustee's requirements before it is required to make payments and otherwise conduct its business in order to maintain and preserve its ongoing concern value.  The Debtor thus respectfully submits that the relief requested is of an emergency nature.

**Notice of the First Day Motions**

9.      Upon the Court's setting of a hearing on the First Day Motions, the Debtor will promptly provide notice to the United States Trustee, the Lenders and their counsel, and the Debtor's list of its twenty largest unsecured creditors, by fax, messenger or overnight delivery.

**Conclusion**

10.      For these reasons, the Debtor respectfully request that the Court grant this Application and allow the First Day Motions to be noticed for hearing on the morning of **December 5, 2014**, and grant such other just and appropriate relief.

Respectfully submitted,

Dated: December 3, 2014                        GOPICNIC BRANDS, INC.


By _____/s/ David R. Doyle_____
          One of its proposed attorneys

Brian L. Shaw (IL ARDC 6216834)
Mark L. Radtke (IL ARDC 6275738)
David R. Doyle (IL ARDC 6303215)
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
Phone: (312) 541-0151
Fax: (312) 980-3888
bshaw@shawfishman.com
mradtke@shawfishman.com
ddoyle@shawfishman.com

*Proposed Counsel for Debtor*

## GROUP EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOPICNIC BRANDS, INC., | ) | Hon. Jacqueline P. Cox |
| | ) | |
| Debtor. | ) | Case No. 14-43382 |

**DEBTOR'S EMERGECY MOTION FOR ORDER UNDER 11 U.S.C. §§ 345 AND 363
AUTHORIZING (I) CONTINUED USE OF EXISTING BUSINESS FORMS AND
RECORDS AND (II) MAINTENANCE OF EXISTING CORPORATE BANK
ACCOUNTS AND CASH MANAGEMENT SYSTEM**

GoPicnic Brands, Inc. ("GPB" or "Debtor"), hereby moves on an emergency basis for entry of an order under 11 U.S.C. §§ 345 and 363 authorizing (i) continued use of existing business forms and records, and (ii) maintenance of existing corporate bank accounts and cash management system (the "Motion"). In support of the Motion, the Debtor respectfully states as follows:

**Introduction**

**A. The Chapter 11 Filing**

1.      On December 3, 2014 (the "Petition Date"), the Debtor filed a voluntary petition in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), thereby commencing the above-captioned case ("Case"). The Debtor continues to manage and operate its businesses as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      The United States Trustee has not yet appointed a creditors' committee in the Case. No trustee or examiner has been appointed.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

{11103-001 MOT A0391140.DOCX 5}

### B.  Background, Equity and Debt Structure

4.      GPB was organized under the laws of the state of Delaware in 2011.  Chicago based GBP is a pioneer and leader in delicious, nutritionally balanced and portable ready-to-eat breakfast, lunch and snacks.  GPB brands are available for a wide range of diet restrictions, including gluten free, vegetarian, vegan and kosher, and all GPB meals contain no artificial colors or flavors, trans fat, high fructose corn syrup or MSG.  GPB brands are available at more than 15,000 retail locations nationwide.

5.      GPB's predecessor, GoPicnic, Inc. ("GPCL") was founded in 2006 by Julia Stamberger ("Stamberger").  In 2011, Stamberger caused GBP to be incorporated in order to separately take ownership of what is now the GPB assets and business operations.  Subsequently, GPB implemented a new capital structure funded by more than $3.5 million in private investment dollars (the "Capitalization Transaction").   To date, Stamberger continues to control and operate the business of GPCL.  Upon information and belief, GPCL is not a debtor under the Bankruptcy Code.

6.      The Capitalization Transaction closed in September 2012.  As a result of the Capitalization Transaction and a rights offering in mid-2014 ("2014 Rights Offering"), the principal equity holders of GPB are (a) Stamberger and certain affiliated entities ("Stamberger Group"), collectively holding approximately 39% of GPB's outstanding equity, (b) Partnership Capital Growth Investors, L.P. ("PCGI"), holding approximately 31% of the GPB's outstanding equity and (c) Clif White Road Investments, LLC ("CWRI"), holding approximately 8% of GPB's outstanding equity.   The GPB equity holdings of PCGI and CWRI include, collectively, approximately 80% of the outstanding shares of GPB's preferred series B stock.

7.     The 2014 Rights Offering was (a) made available to all GPB shareholders, (b) priced accordingly to an independent, third party appraisal of GPB and (c) implemented after the waiver of certain anti-dilution provisions.  The 2014 Rights Offering resulted in approximately $2.2 million of additional equity being invested into GPB.  The equity percentages in the preceding paragraph reflect adjustments made on account of the 2014 Rights Offering.

8.     Currently, GPB has a $5 million revolving loan facility with Wells Fargo, N.A. ("Pre-Petition Facility"), which is secured by perfected, first priority liens on substantially all of GPB's assets.  As of the Petition Date, the outstanding balance of the Pre-Petition Facility is approximately $1,884,317.26 and GPB has no availability under its borrowing base formula.

9.     Previously, in December 2013, PCGI and CWRI agreed to purchase from GoPicnic secured mezzanine debt in an aggregate principal amount of $2 million (the "Mezzanine Debt"). As of the Petition Date, the outstanding balance of the Mezzanine Debt is approximately $2.3 million.  Pursuant to an August 2014 subordination agreement with Wells Fargo, the Mezzanine Debt is secured by liens on all of GoPicnic's assets that are junior to the interests of Well Fargo.

**C.  Events Leading to Bankruptcy**

10.     Despite its strong brand recognition, GPB finds itself seeking relief under chapter 11 of the Bankruptcy Code for two primary, and not entirely unrelated, reasons.

11.     First, GPB has under-performed and failed to meet operational projections despite the existence of what GPB believes are a solid business model and quality product.  As a result, and despite the insertion of over $5 million in equity over the past three years, GPB has fallen short of its yearly projections, has experienced little to no growth in the past two years, and finds itself in need of additional liquidity.

12.     Second, GPB is currently in the midst of a dispute with the Stamberger Group which arose after the GPB board of directors removed Stamberger from her position as an officer and director of GPB in April 2014.  Since April 2014, the Stamberger Group has demanded redemption of its equity interest in GPB and additional priority payments from GPB (i.e., payments with priority over the rights of the holders of the preferred series B stock).  In addition, Stamberger has threatened GPB, PCGI and CWRI with claims arising out of Stamberger's removal.  GPB and the Stamberger Group have engaged in discussions in an attempt to resolve Stamberger's demands. However, in the interim, the monetary and time costs attendant to addressing Stamberger's threats have only served to exacerbate GPB's current financial distress and further decreased GPB's ability to obtain more liquidity outside of the bankruptcy process.

13.     As a result of these issues, GPB's board of directors and management have determined that it must take immediate action to preserve GPB's operations and value as a going concern.  Accordingly, in September 2014, GPB retained Imperial Capital to assist it in the marketing and sale of its business.

**Maintenance of Bank Accounts and Cash Management System**

14.     The Office of the United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases.  These guidelines require chapter 11 debtors to, among other things: (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) maintain the debtor in possession bank accounts only in depositories that agree to post a bond or pledge securities for all deposits not insured or guaranteed by the United States or by a department, agency or instrumentality of the United States, or backed by the full faith and credit of the United States; (c) establish a general account for the purpose of paying bills incurred during the administration of the case; (d) establish

a separate tax trust account so that it may escrow the necessary funds for the payment of postpetition taxes when such liabilities are incurred; and (e) obtain checks for all debtor in possession accounts which bear the designation "Debtor In Possession," the bankruptcy case number, and the type of accounts.

15.     For the reasons set forth below, the Debtor requests permission to maintain its bank accounts and cash management system notwithstanding the United States Trustee's guidelines.

### A.  The Bank Accounts

16.     As of the Petition Date, the Debtor maintains the following bank accounts at Wells Fargo and PNC Bank (the "Banks"), which are large, nationally recognized banking institutions with FDIC insurance (up to an applicable limit per account): (i) a deposit account at PNC Bank funded by online credit card payments and used for paying accounts payable (the "PNC Account"); (ii) a deposit account at Wells Fargo funded by checks from customers and used to pay down the Pre-Petition Facility (the "Deposit Account"); and (iii) an operating account at Wells Fargo funded by the Pre-Petition Facility and used to pay accounts payable (the "Operating Account").

17.     The Bank Accounts are summarized in the following chart:

| Bank / Bank Account | Account No. (last 4 digits) | Type and Purpose of Account | Source of Funds | Balance on Petition Date |
|---|---|---|---|---|
| PNC Bank / PNC Account | 7452 | Deposit & disbursement. Account used to process credit card collections from website sales. Debtor can write checks from account, usually for accounts payable. | Online Sales (Credit Card Payment) | $986.73 |
| Wells Fargo / Deposit Account | 8015 | Deposit only; account used to pay down Pre-Petition Facility at Wells Fargo. | Checks collected from customers on prior day | $22,512.13 |

| Bank / Bank Account | Account No. (last 4 digits) | Type and Purpose of Account | Source of Funds | Balance on Petition Date |
|---|---|---|---|---|
| Wells Fargo / Operating Account | 8023 | Disbursement only; account used to pay accounts payable. | Pre-Petition Facility at Wells Fargo | $-522.27 |

All three Bank Accounts are tied into the Debtor's Pre-Petition Facility with Wells Fargo and its use of proceeds and cash collateral therefrom.

18.     The Debtor requests permission to maintain the Bank Accounts notwithstanding the United States Trustee's requirement that existing bank accounts be closed and new postpetition bank accounts be opened.  If enforced in this case, such requirements would disrupt the Debtor's business and impair the Debtor's efforts to preserve the going concern value of its estate.

19.     In addition, maintenance of the Bank Accounts is necessary to avoid delays in payments to administrative creditors and to ensure as smooth a transition into chapter 11 as possible with minimal disruption.  Subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtor requests that the Bank Accounts be deemed debtor in possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

20.     The Debtor represents that if the relief requested in this Motion is granted, it will not allow any debts incurred before the Petition Date to be paid, except to the extent that the Court may authorize the payment of such debts.

**B.  The Debtor's Cash Management System**

21.     In order to use the property of its estate and to ensure an orderly transition into chapter 11, the Debtor also requests authority to continue to use its existing cash management system as it may be modified as required by the Debtor in the exercise of its business judgment.

The Debtor's cash management system allows the Debtor to manage all of its cash flow needs and includes the necessary account mechanisms to enable the Debtor to trace funds, ensure that all transactions are adequately documented and readily ascertainable, and comply with applicable requirements.  The Debtor will continue to maintain detailed records reflecting all transfers of funds, such as the transfer of funds for payroll reimbursements.

22.    A requirement that the Debtor adopt new cash management systems at this critical stage of the case would be expensive, would create unnecessary administrative problems (including the possibility that transactions would not be adequately documented), and would be much more disruptive than productive.  Maintenance of the existing cash management system during this initial phase of the case is in the best interests of all creditors and other parties in interest.

23.    In furtherance of this goal, the Debtor requests that the Banks be authorized and directed to continue to administer the Bank Accounts as such accounts were maintained prepetition, without interruption and in the usual and ordinary course, and to pay any and all checks, drafts, wires, or other transfers issued on the Bank Accounts on account of any claims arising on or after the Petition Date, so long as sufficient funds are in the Bank Accounts and any such payments comply with any cash collateral budget.

24.    To effectuate the foregoing, the Debtor requests that (a) the Banks be authorized and directed to honor all representations from the Debtor as to which checks should be honored or dishonored and (b) any final payment made by the Banks prior to the Petition Date against any of the Bank Accounts, shall be deemed to be paid prepetition, whether or not actually debited from the Bank Accounts prepetition.  To the extent that the Debtor directed that any prepetition checks

be dishonored, the Debtor reserves the right to issue replacement checks to pay the amounts related to such dishonored checks, consistent with any applicable orders of this Court.

**Maintenance of Existing Business Forms and Checks**

25.      In order to minimize expenses to its estate, the Debtor also requests that it be authorized to continue to use all correspondence, business forms and checks existing immediately prior to the Petition Date without reference to the Debtor's status as debtor in possession.

26.      Parties doing business with the Debtor likely will be aware of the Debtor's status as a debtor in possession.  Each of the Debtor's creditors will receive direct notice of the commencement of the case.

27.      Changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtor's estate and disruptive to its business operations and would not confer any benefit upon those dealing with the Debtor.  For these reasons, the Debtor requests that it be authorized to use existing checks and business forms without being required to place the label "Debtor in Possession" on each.

**Notice**

28.      Upon the Court's setting of a hearing on the First Day Motions, the Debtor will promptly provide notice to the United States Trustee, the Lenders and their counsel, and the Debtor's list of its twenty largest unsecured creditors, by fax, messenger or overnight delivery.  In light of the nature of the relief requested, the Debtor submits that no further notice is required.

WHEREFORE, the Debtor requests the entry of an order (a) granting the relief requested herein and (b) granting such other just and appropriate relief.

Respectfully submitted,

Dated: December 3, 2014                    GOPICNIC BRANDS, INC.


By:____/s/ David R. Doyle_____
    One of its proposed attorneys

Brian L. Shaw (IL ARDC 6216834)
Mark L. Radtke (IL ARDC 6275738)
David R. Doyle (IL ARDC 6303215)
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
Phone: (312) 541-0151
Fax: (312) 980-3888
bshaw@shawfishman.com
mradtke@shawfishman.com
ddoyle@shawfishman.com

*Proposed Counsel for Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOPICNIC BRANDS, INC., | ) | Hon. Jacqueline P. Cox |
| | ) | |
| Debtor. | ) | Case No. 14-43382 |

**ORDER AUTHORIZING DEBTOR TO (I) MAINTAIN EXISTING BANK ACCOUNTS,**
**(II) CONTINUE USE OF EXISTING CASH MANAGEMENT SYSTEM, AND**
**(III) CONTINUE USE OF BUSINESS FORMS**

Upon the motion (the "Motion," and all undefined terms herein having the meanings in the Motion) of GoPicnic Brands, Inc. (the "Debtor"), requesting the entry of an order, pursuant to 11 U.S.C. §§ 105(a), 345 and 363, authorizing the Debtor to (i) maintain its existing Bank Accounts, (ii) continue use of its existing cash management system, and (iii) continue use of its existing business forms; it appearing that notice of the Motion and the opportunity for a hearing on the Motion were appropriate under the particular circumstances and that no other or further notice need be given; it appearing that there is good cause to grant the relief requested; the Court having jurisdiction over the parties and the subject matter of the Motion; and, there being no objection to the relief requested; it is ORDERED:

1. The Motion is granted, as set forth herein.

2. Pursuant to 11 U.S.C. §§ 105(a), 345(b) and 363(b), the Debtor is authorized to (i) maintain its existing Bank Accounts in the same manner and with the same account numbers, styles, and document forms as those employed prior to the Petition Date, (ii) continue use of its existing cash management system as it may be modified, as required by the Debtor in the exercise of its business judgment, and (iii) continue use of its existing business forms.

3. The Banks are authorized and directed to continue to administer the Bank Accounts as such accounts were maintained prepetition, without interruption and in the usual and ordinary course, and to pay any and all checks, drafts, wires, or other transfers issued on the Bank Accounts on account of any claims arising on or after the Petition Date so long as sufficient funds are in the Bank Accounts and such payments comply with any applicable cash collateral budget.

4. The Banks are authorized and directed to honor all representations from the Debtor as to which checks should be honored or dishonored. Any final payment made by the Banks prior to the Petition Date against any of the Bank Accounts shall be deemed to be paid prepetition, whether or not actually debited from the Bank Accounts prepetition.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOPICNIC BRANDS, INC., | ) | Hon. Jacqueline P. Cox |
| | ) | |
| Debtor. | ) | Case No. 14-43382 |

**DEBTOR'S EMERGENCY MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 507 AND 363 (A) AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF PREPETITION PRIORITY SALARIES, COMMISSIONS AND EMPLOYEE BENEFITS AND CONTINUATION OF EMPLOYEE BENEFIT PLANS AND PROGRAMS POSTPETITION, (B) AUTHORIZING, BUT NOT DIRECTING, DEDUCTIONS FROM EMPLOYEES' PAYCHECKS, AND (C) DIRECTING ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS**

GoPicnic Brands, Inc. ("GPB" or "Debtor"), submits this motion on an emergency basis pursuant to §§ 105, 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for entry of an order: (a) authorizing, but not directing, the Debtor to pay employee-related prepetition priority obligations to, or for the benefit of, employees and commissioned brokers; (b) authorizing, but not directing, the Debtor to make appropriate deductions from employees' paychecks; (c) directing all banks to honor prepetition checks for payment of the Debtor's prepetition employee obligations; (d) authorizing, but not directing, the Debtor to continue postpetition the employee benefits in effect immediately prior to commencement of the above-captioned case, and (e) granting related relief (the "Motion"). In support of this Motion, the Debtor respectfully states as follows:

### Introduction

#### A. The Chapter 11 Filing

1.　　On December 3, 2014 (the "Petition Date"), the Debtor filed a voluntary petition in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), thereby commencing the above-captioned case ("Case"). The

Debtor continues to manage and operate its businesses as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      The United States Trustee has not yet appointed a creditors' committee in the Case. No trustee or examiner has been appointed.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**B.  Background, Equity and Debt Structure**

4.      GPB was organized under the laws of the state of Delaware in 2011.  Chicago based GBP is a pioneer and leader in delicious, nutritionally balanced and portable ready-to-eat breakfast, lunch and snacks.  GPB brands are available for a wide range of diet restrictions, including gluten free, vegetarian, vegan and kosher, and all GPB meals contain no artificial colors or flavors, trans fat, high fructose corn syrup or MSG.  GPB brands are available at more than 15,000 retail locations nationwide.

5.      GPB currently employs approximately 23 full-time salaried employees and one part-time hourly employee (the "Employees").

6.      GPB's predecessor, GoPicnic, Inc. ("GPCL") was founded in 2006 by Julia Stamberger ("Stamberger").  In 2011, Stamberger caused GBP to be incorporated in order to separately take ownership of what is now the GPB assets and business operations.  Subsequently, GPB implemented a new capital structure funded by more than $3.5 million in private investment dollars (the "Capitalization Transaction").   To date, Stamberger continues to control and operate the business of GPCL.  Upon information and belief, GPCL is not a debtor under the Bankruptcy Code.

7.      The Capitalization Transaction closed in September 2012.  As a result of the Capitalization Transaction and a rights offering in mid-2014 ("2014 Rights Offering"), the principal equity holders of GPB are (a) Stamberger and certain affiliated entities ("Stamberger Group"), collectively holding approximately 39% of GPB's outstanding equity, (b) Partnership Capital Growth Investors, L.P. ("PCGI"), holding approximately 31% of the GPB's outstanding equity and (c) Clif White Road Investments, LLC ("CWRI," and collectively with Wells Fargo and PCGI, the "Lenders"), holding approximately 8% of GPB's outstanding equity.  The GPB equity holdings of PCGI and CWRI include, collectively, approximately 80% of the outstanding shares of GPB's preferred series B stock.

8.      The 2014 Rights Offering was (a) made available to all GPB shareholders, (b) priced accordingly to an independent, third party appraisal of GPB and (c) implemented after the waiver of certain anti-dilution provisions.  The 2014 Rights Offering resulted in approximately $2.2 million of additional equity being invested into GPB.  The equity percentages in the preceding paragraph reflect adjustments made on account of the 2014 Rights Offering.

9.      Currently, GPB has a $5 million revolving loan facility with Wells Fargo, N.A. ("Pre-Petition Facility"), which is secured by perfected, first priority liens on substantially all of GPB's assets.  As of the Petition Date, the outstanding balance of the Pre-Petition Facility is approximately $1,884,317.26 and GPB has no availability under its borrowing base formula.

10.      Previously, in December 2013, PCGI and CWRI agreed to purchase from GoPicnic secured mezzanine debt in an aggregate principal amount of $2 million (the "Mezzanine Debt").  As of the Petition Date, the outstanding balance of the Mezzanine Debt is approximately $2.3 million.  Pursuant to an August 2014 subordination agreement with Wells Fargo, the Mezzanine Debt is secured by liens on all of GoPicnic's assets that are junior to the interests of Well Fargo.

### C.  Events Leading to Bankruptcy

11.    Despite its strong brand recognition, GPB finds itself seeking relief under chapter 11 of the Bankruptcy Code for two primary, and not entirely unrelated, reasons.

12.    First, GPB has under-performed and failed to meet operational projections despite the existence of what GPB believes are a solid business model and quality product.  As a result, and despite the insertion of over $5 million in equity over the past three years, GPB has fallen short of its yearly projections, has experienced little to no growth in the past two years, and finds itself in need of additional liquidity.

13.    Second, GPB is currently in the midst of a dispute with the Stamberger Group which arose after the GPB board of directors removed Stamberger from her position as an officer and director of GPB in April 2014.  Since April 2014, the Stamberger Group has demanded redemption of its equity interest in GPB and additional priority payments from GPB (i.e., payments with priority over the rights of the holders of the preferred series B stock).  In addition, Stamberger has threatened GPB, PCGI and CWRI with claims arising out of Stamberger's removal.  GPB and the Stamberger Group have engaged in discussions in an attempt to resolve Stamberger's demands.  However, in the interim, the monetary and time costs attendant to addressing Stamberger's threats have only served to exacerbate GPB's current financial distress and further decreased GPB's ability to obtain more liquidity outside of the bankruptcy process.

~~14.~~    As a result of these issues, GPB's board of directors and management have determined that it must take immediate action to preserve GPB's operations and value as a going concern.  Accordingly, in September 2014, GPB retained Imperial Capital to assist it in the marketing and sale of its business.

**Relief Requested**

15.     By this Motion, the Debtor requests that the Court enter an order pursuant to §§ 507(a)(4) and (a)(5) and 363(b)(1) of the Bankruptcy Code authorizing the Debtor to (a) pay or otherwise honor all Employee-related prepetition priority obligations of the Debtor to, or for the benefit of, the Employees, (b) make appropriate deductions from Employees' paychecks, and (c) continue postpetition, for the benefit of retained employees, the Debtor's employee benefit plans and programs as described below.

16.     The Employee-related obligations (the "Prepetition Employee Obligations") include, without limitation:

    a.   unpaid prepetition wages, salaries and commissions, up to the statutory maximum of $12,475 per employee;

    b.   reimbursable business expenses incurred prior to the Petition Date; and

    c.   employee health and welfare benefit claims arising before the Petition Date.

17.     The Debtor also seeks an order directing all banks and financial institutions to honor prepetition checks for payment of the Prepetition Employee Obligations.

18.     In order to minimize the personal hardship that the Employees will suffer if Prepetition Employee Obligations are not paid when due or as expected, and to maintain morale and assist in the Debtor's ongoing operations, the Debtor respectfully submits that it is in the best interests of its estate, creditors and parties-in-interest for this Court to authorize payment of the Prepetition Employee Obligations, to allow the Debtor to make appropriate deductions from the Employees' paychecks, and to continue the Employee Benefits for the benefit of the Employees in the ordinary course of the Debtor's businesses.

**A.  Unpaid Wages and Salaries**

19.    As of the Petition Date, the workforce consisted of approximately 23 salaried full-time employees and one hourly part-time employee.  The Debtor's payroll is bi-weekly and paid one week in arrears.  The next payroll is due on December 12, 2014, for the period of November 23, 2014 through December 6, 2014 (the "Payroll Period").

20.    Because a portion of the Payroll Period occurred prepetition (from November 23 through December 3), the Debtor seeks authority to pay wages and salary that accrued during that prepetition time period (in the aggregate, approximately $54,579.05) (the "Unpaid Salaries").  A chart showing the Unpaid Salaries, with employee names redacted, is attached hereto as Exhibit A.

**B.  Reimbursable Business Expenses**

21.     It is the Debtor's policy to reimburse Employees for certain expenses within the scope of their employment, including expenses for business-related travel, lodging, and meals (the "Reimbursement Obligations").  All such expenses were incurred on the Debtor's behalf and with the understanding that the Employees would be reimbursed.  The Debtor estimates that, as of the Petition Date, approximately $19,871.89 is owed on account of outstanding Reimbursement Obligations.  The Debtor's request the authority to pay all such accrued prepetition Reimbursement Obligations, but in no event more than the statutory maximum for any given Employee.

**C.  Broker Commissions**

22.    As part of its sales strategy, the Debtor pays certain broker commissions to eight (8) third-party brokers.  Commissions are based on monthly cash receipts and are paid thirty (30) days after the end of the applicable month.  In calendar year 2014, the aggregate average monthly commissions were $17,902.40.   The total commissions accrued during October 2014 are

approximately $8,003.60, and the total commissions accrued during November 2014 are approximately $9,066.75.  None of the commissions for these two months have been paid.  The Debtor seeks authority, but not direction, to pay them.

**D.  Paid Time Off**

23.     As of the Petition Date, Employees have accrued paid time off ("PTO") that, as of December 31, 2014, will equal approximately $35,045.30.  The PTO does not carry over into calendar year 2015.  The Debtor requests authority for the Employees to use such accrued personal time and vacation time in the ordinary course of business, including the ability to "cash out" any unused vacation time in the event of termination of employment.  (Any employee that opts to "cash out" would not, in combination with their unpaid salary, receive more than the statutory maximum under § 507(a)(4) of the Bankruptcy Code.)  The Debtor also requests authority for the Employees to continue to accrue personal time and vacation time in the ordinary course of its business under the customary and/or contractual terms and conditions of such Employees' employment.

**E.  Remitting and/or Paying Appropriate Deductions and Withholdings**

24.     During each applicable pay period, the Debtor routinely deducts certain amounts from paychecks, including, without limitation, (a) garnishments, child support and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee Benefits discussed herein (such as an Employee's share of health care benefits, insurance premiums, 401(k) contributions and other miscellaneous deductions) (collectively, the "Deductions") and forwards those amounts to various third party recipients.  However, due to the commencement of this Case, these funds were deducted from Employees' earnings, but may not have been forwarded to the appropriate third party recipients prior to the Petition Date.  Accordingly, the Debtor seeks authority for it or its agents to continue to forward these prepetition

Deductions to the applicable third party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

25.     Further, the Debtor is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes and social security taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authority.  The Debtor must then match from its own funds for social security and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").

26.     Before the Petition Date, the Debtor withheld the appropriate amounts from Employees' earnings for the Payroll Taxes, but such funds may not have been forwarded to the appropriate taxing authorities prior to the Petition Date.  As a result, the Debtor seeks authority, but not direction, for it or its agents to continue to honor and process the prepetition obligations with respect to Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

**F.  Employee Benefits**

27.     The Debtor also offers Employees many standard benefits under its Employee Benefits programs.  Specifically, certain of the Employees are offered a choice of, among other things, a 401k plan through Principal Financial Group, short-term and long-term disability benefits through Standard Insurance, health and dental insurance through Blue Cross Blue Shield, and life insurance through Dearborn National (the "Benefits").  The Debtor typically matches 100% of the first 3% of an employee's 401k contribution and 50% of the next 2% of an employee's contribution, up to a total 4% match.  For the Payroll Period, the Employees will pay, in the aggregate, approximately $5,209.43 with respect to the Benefits (including medical dental

payments and 401k contributions), and the Debtor will pay an aggregate amount of approximately $176.92 in 401k matching contributions.

28.     Before the Petition Date, the Debtor withheld the appropriate amounts from Employees' earnings for the Benefits, but such funds may not have been forwarded to the appropriate recipient prior to the Petition Date.  As a result, the Debtor seeks authority, but not direction, for it or its agents to continue to honor and process the prepetition obligations with respect to the Benefits on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

29.     The Debtor requests authority to continue to maintain the Benefits in its sole discretion and to pay any prepetition amounts related thereto.

**G. Workers Compensation Insurance**

30.     The Debtor maintains workers' compensation insurance through Cincinnati Financial Company.  The monthly premium is approximately $781.00.  It is critical that the Debtor be permitted to continue its workers' compensation programs and to pay any reconciled balances and unpaid premiums because alternative arrangements for workers' compensation coverage would most certainly be more costly and the failure to provide coverage may subject the Debtor and/or its officers to severe penalties.  Accordingly, the Debtor seeks authority to continue to pay premiums related to workers' compensation, to pay any unpaid premiums that became due prepetition (if any) and to continue the workers' compensation program in the ordinary course of business in its sole discretion.

**H. Summary of Requests**

31.     In sum, pursuant to this Motion, the Debtor seeks to pay the Prepetition Employee Obligations and to continue to process the Benefits in effect immediately prior to the filing of this

Case.  The Debtor submits that the amounts to be paid to the Employees pursuant to this Motion are reasonable compared with the importance and necessity of (i) preserving the morale of Employees and (ii) ensuring the continued operation of the company.  Therefore, the Debtor seeks authorization, but not direction, to satisfy the Prepetition Employee Obligations and continue to process the Benefits and maintain accruals of those benefits in the ordinary course of business.

### I.   Banks to Honor Prepetition Checks for Prepetition Employee Obligations

32.     In addition, the Debtor requests that all applicable banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and to honor all fund transfer requests made by the Debtor related to the Prepetition Employee Obligations, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date.  The Debtor represents that checks other than those for the Prepetition Employee Obligations will not be honored inadvertently.

33.     Moreover, the Debtor represents that it has sufficient cash reserves to promptly pay all of the Prepetition Employee Obligations, to the extent described herein, on an ongoing basis and in the ordinary course of its business.

### Applicable Authority

34.     Section 507(a)(4) and (a)(5) of the Bankruptcy Code give priority up to $12,475 per individual for prepetition claims for wages, salaries, vacation, sick leave and contributions to employee benefit plans.  The Debtor believes that the Prepetition Employee Obligations that they seek to pay are entitled to priority under § 507(a)(4) and (a)(5) of the Bankruptcy Code, and, as such, will eventually be paid in full.  *See* 11 U.S.C. § 1129(a)(9).  Therefore, payment of the Prepetition Employee Obligations in the ordinary course of business merely accelerates the timing

of payment of obligations that will otherwise be paid in any event, thereby not disrupting the Bankruptcy Code's priority scheme.

35.     This Court may also authorize the Debtor's proposed payment of the Prepetition Employee Obligations under section 363(b)(1) of the Bankruptcy Code.   Section 363(b)(1) provides that a bankruptcy court, after notice and a hearing, may authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."   *See* 11 U.S.C. § 363(b)(1).   Although stated various ways, courts generally hold that a debtor's decision to enter into a transaction outside of the ordinary course of business is governed by the business judgment standard.   3 COLLIER ON BANKRUPTCY ¶ 363.02[4] (16th ed. 2012); *see e.g. In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (requiring "articulated business justification" for sale under § 363(b)(1)); *In re U.S. Airways Grp., Inc.*, 287 B.R. 643, 645 (Bankr. E.D. Va. 2002).

36.     When applying the "business judgment" rule, courts show great deference to a debtor's decision making.   *See, e.g., In re Castre*, 312 B.R. 426, 430 (Bankr. D. Colo. 2004); *In re Murphy*, 288 B.R. 1, 5 (D. Me. 2002); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D. N.Y. 1998).

37.     The Seventh Circuit's decision in *In re Kmart*, 359 F.3d 866, 872-73 (7th Cir. 2004), does not foreclose the use of Section 363(b)(1) to satisfy a debtor's prepetition employee obligations.   Rather, Kmart stands for the proposition that section 363(b)(1) should be construed "to do the least damage possible to priorities established by contract and by other parts of the Bankruptcy Code."   *Id.* at 872.

38.     In addition, § 105(a) authorizes this Court, pursuant to its general equitable powers, to issue such orders as are necessary to carry out the provisions of the Bankruptcy Code.   The

Court's use of such authority to implement the priority provisions of § 507(a) under appropriate circumstances is well established.

39.     In this Case, the Debtor does not seek to elevate the unsecured claims of a select few.  Rather, the Debtor is attempting to treat each of its Employees equally, and seeks Court authority to pay only such amounts entitled to priority treatment under the Bankruptcy Code. Further, since these priority claims must be satisfied in full before the claims of the Debtor's general unsecured creditors, no unsecured creditor will be prejudiced by an order granting the relief requested herein.  Accordingly, appropriate circumstances exist to grant this Motion.

40.     Moreover, the Debtor believes that there is a significant risk that Employees whose Prepetition Employee Obligations are not honored in the ordinary course of business will terminate their employment relationships with the Debtor.  The continued service and dedication of these Employees is critical to the Debtor's ongoing business operations.  In order to retain its Employees, maintain morale, and avoid jeopardizing the Debtor's business operations and customer and vendor relationships, the Debtor must have authority to pay or otherwise satisfy all Prepetition Employee Obligations.

41.     The relief requested in this Motion is appropriate—and indeed critical—and should be authorized under §§ 507(a)(4), 507(a)(5) and 363(b) of the Bankruptcy Code.  Based upon the foregoing, the Debtor requests that this Court enter an order authorizing, but not directing, the Debtor to pay the Prepetition Employee Obligations as described herein and to continue the Employee Benefits plans postpetition in the ordinary course of business.

42.     Nothing in this Motion shall be construed as a request for authority to assume any executory contract under § 365 of the Bankruptcy Code or affect the Debtor's right to assume or reject any executory contract.

### Request for Shortened and Limited Notice

43.     Upon the Court's setting of a hearing on the First Day Motions, the Debtor will promptly provide notice to the United States Trustee, the Lenders and their counsel, and the Debtor's list of its twenty largest unsecured creditors, by fax, messenger or overnight delivery.  In light of the limited and time-sensitive nature of the relief requested, the Debtor requests that the Court waive further notice of this Motion for cause shown.

WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) authorizing, but not directing, the Debtor to pay or otherwise honor the Debtor's Prepetition Employee Obligations, (b) authorizing the Debtor to make deductions from the Employees' paychecks, (c) authorizing, but not directing, the Debtor to continue postpetition the Benefits in effect immediately prior to the Petition Date, (d) directing all banks to honor prepetition checks for payment of such obligations, and (e) granting the Debtor such other just and appropriate relief.

Respectfully submitted,

Dated: December 3, 2014

GOPICNIC BRANDS, INC.

By ____/s/ David R. Doyle_____
        One of its proposed attorneys

Brian L. Shaw (IL ARDC 6216834)
Mark L. Radtke (IL ARDC 6275738)
David R. Doyle (IL ARDC 6303215)
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
Phone: (312) 541-0151
Fax: (312) 980-3888
bshaw@shawfishman.com
mradtke@shawfishman.com
ddoyle@shawfishman.com

*Proposed Counsel for Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOPICNIC BRANDS, INC., | ) | Hon. Jacqueline P. Cox |
| | ) | |
| Debtor. | ) | Case No. 14-43382 |

**ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION SALARY AND
COMMISSION OBLIGATIONS; (II) AUTHORIZING THE CONTINUATION OF
EMPLOYEE BENEFIT PLANS; AND (III) DIRECTING ALL BANKS TO HONOR
PREPETITION CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE
OBLIGATIONS**

Upon consideration of the emergency motion ("Motion") (unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Motion) of the Debtor for entry of an order pursuant to 11 U.S.C. §§ 105, 363(b) and 507(a) and Fed. R. Bankr. P. 6003, (a) authorizing, but not directing, the Debtor to pay or otherwise honor the Debtor's employee-related prepetition priority obligations to, or for the benefit of, employees and commissioned-brokers, and to continue postpetition the employee benefit plans and programs in effect immediately prior to the filing of this Case; (b) authorizing, but not directing, the Debtor to make deductions from employees' paychecks; and (c) directing all banks to honor prepetition checks for payment of the Debtor's prepetition employee obligations; it appearing that notice of the Motion and the opportunity for a hearing on the Motion were appropriate under the particular circumstances and that no other or further notice need be given; it appearing that there is good cause to grant the relief requested; the Court having jurisdiction over the parties and the subject matter of the Motion; it is ORDERED:

1. The Debtor is authorized, but not directed, to pay the Prepetition Employee Obligations, as set forth in the Motion.

2. The Debtor is authorized, but not directed, to pay and continue to provide the Benefits in the ordinary course of business, as well as pay prepetition obligations with respect to medical and dental coverage and the 401(k) plan.

3. This Order shall not permit any Employee to receive more than the $12,475 entitled to priority under § 507(a)(4) and (a)(5).

4. The Debtor is authorized, but not directed, to pay any and all withholding taxes and other deductions, including, but not limited to, Social Security taxes, federal, state and local income taxes and other types of withholding, whether arising prior to or after the Petition Date.

5. The Debtor is authorized, but not directed, to continue to pay premiums related to workers' compensation, to pay any unpaid premiums that became due prepetition and to

continue the workers' compensation program in the ordinary course of business in its sole discretion.

6.  As applicable, the Debtor's bank is hereby authorized and directed, when requested by the Debtor, to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts to pay the Prepetition Employee Obligations and Benefits authorized by this Order, whether those checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments and conforms with any approved cash collateral budget.

7.  Nothing in this Order, nor any payments made by the Debtor pursuant to this Order, shall be deemed an assumption of an employee benefit plan, employment agreement, or other programs or contracts, or otherwise affect the Debtor's rights to assume or reject any such plan, agreement or contract.

8.  This Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this Order.

9.  Notice of the Motion as provided is sufficient, and further notice is excused for cause shown.

**EXHIBIT A**

| First | Last | Pre-Petition Salary/Wages | Standard Gross Pay | Taxes | Deductions | Net Pay | Employer Taxes |
|---|---|---|---|---|---|---|---|
| ■ | ■ | $ 2,615.39 | $ 3,269.24 | $ 1,056.39 | $ - | $ 2,212.85 | $ 250.09 |
| ■ | ■ | $ 884.00 | $ 1,105.00 | $ 248.23 | $ 274.16 | $ 582.61 | $ 84.53 |
| ■ | ■ | $ 2,923.08 | $ 3,653.85 | $ 1,152.60 | $ - | $ 2,501.25 | $ 445.77 |
| ■ | ■ | $ 172.80 | $ 216.00 | $ 23.25 | $ - | $ 192.75 | $ 26.35 |
| ■ | ■ | $ 1,130.78 | $ 1,413.47 | $ 229.81 | $ - | $ 1,183.66 | $ 108.14 |
| ■ | ■ | $ 4,615.39 | $ 5,769.24 | $ 1,174.92 | $ - | $ 4,594.32 | $ 83.65 |
| ■ | ■ | $ 3,076.93 | $ 3,846.16 | $ 718.63 | $ 457.53 | $ 2,669.70 | $ 259.24 |
| ■ | ■ | $ 1,384.62 | $ 1,730.77 | $ 398.46 | $ - | $ 1,332.31 | $ 200.78 |
| ■ | ■ | $ 2,615.39 | $ 3,269.24 | $ 551.55 | $ - | $ 2,717.69 | $ 250.09 |
| ■ | ■ | $ 884.00 | $ 1,105.00 | $ 218.17 | $ 123.47 | $ 763.36 | $ 75.08 |
| ■ | ■ | $ 6,153.85 | $ 7,692.31 | $ 1,835.37 | $ - | $ 5,856.94 | $ 111.54 |
| ■ | ■ | $ 1,107.70 | $ 1,384.62 | $ 302.74 | $ - | $ 1,081.88 | $ 105.93 |
| ■ | ■ | $ 1,538.46 | $ 1,923.08 | $ 424.72 | $ 134.61 | $ 1,363.75 | $ 147.11 |
| ■ | ■ | $ 4,615.39 | $ 5,769.24 | $ 1,577.11 | $ 395.38 | $ 3,796.75 | $ 411.10 |
| ■ | ■ | $ 2,923.08 | $ 3,653.85 | $ 794.94 | $ 620.79 | $ 2,238.12 | $ 279.52 |
| ■ | ■ | $ 884.00 | $ 1,105.00 | $ 223.70 | $ 88.74 | $ 792.56 | $ 77.75 |
| ■ | ■ | $ 768.00 | $ 960.00 | $ - | $ - | $ 960.00 | $ - |
| ■ | ■ | $ 815.39 | $ 1,019.24 | $ 145.09 | $ - | $ 874.15 | $ 124.35 |
| ■ | ■ | $ 2,215.39 | $ 2,769.24 | $ 777.81 | $ 110.82 | $ 1,880.61 | $ 203.37 |
| ■ | ■ | $ 2,307.70 | $ 2,884.62 | $ 713.94 | $ - | $ 2,170.80 | $ 220.68 |
| ■ | ■ | $ 4,615.39 | $ 5,769.24 | $ 1,541.47 | $ 2,337.32 | $ 1,890.45 | $ 78.91 |
| ■ | ■ | $ 947.70 | $ 1,184.62 | $ 201.34 | $ - | $ 983.28 | $ 90.63 |
| ■ | ■ | $ 2,307.70 | $ 2,884.62 | $ 825.00 | $ - | $ 2,059.62 | $ 220.68 |
| ■ | ■ | $ 3,076.93 | $ 3,846.16 | $ 1,098.08 | $ - | $ 2,748.08 | $ 294.23 |
| Total | | $ 54,579.05 | $ 68,223.81 | $ 16,233.32 | $ 4,542.82 | $ 47,447.49 | $ 4,149.52 |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 14-43382 |
| GOPICNIC BRANDS, INC., | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |

**DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO
(1) USE CASH COLLATERAL AND (2) PROVIDE
ADEQUATE PROTECTION, AND FOR RELATED RELIEF**

GoPicnic Brands, Inc. ("GoPicnic" or "Debtor"), pursuant to 11 U.S.C. §§ 361, 363(c)(2), 363(e), Fed. R. Bankr. P. 4001(b) and 4001(d), and Local Rule 4001-2, hereby requests that this Court enter an order in the form attached hereto ("Cash Collateral Order") authorizing the Debtor to (i) use cash collateral on an interim basis and after a final hearing ("Final Hearing") on an extended basis to the extent necessary to operate the Debtor's business as a going concern and thereby maintain and preserve the Debtor's assets, and (ii) provide adequate protection to the Debtor's secured creditors, Wells Fargo Bank, National Association ("Wells Fargo"), Partnership Capital Growth Investors III, L.P. ("PCGI"), and (c) Clif White Road Investments, LLC ("CWRI" and collectively, the "Lenders"), on account of their alleged prepetition liens and security interests, all of the foregoing in accordance with the Cash Collateral Order and the budget attached to the Cash Collateral Order as <u>Exhibit A</u> (as may be modified with the Lenders' consent, the "Budget").  In support of this motion, the Debtor states as follows:

## I. <u>FED. R. BANKR. P. 4001(b)(1)(B) and L.R. 4001-2 DISCLOSURES</u>

1.      The following disclosures are made pursuant to Fed. R. Bankr. P. 4001(b)(1)(B):

   a.      The only entities with an asserted interest in the subject cash collateral are the Lenders, though the Debtor has not yet determined whether the alleged claim and lien interests held by each of the Lenders are enforceable.  The

Debtor asserts that under the applicable terms of the subordination agreement between Wells Fargo, on the one hand, and PCGI and CWRI, on the other, PCGI and CWRI are restricted from exercising any adequate protection rights in connection with their claims against the Debtor until the Wells Fargo indebtedness is paid in full.

b.      The Debtor requires the use of the Lenders' purported cash collateral in order to continue business operations and to maintain and preserve the going concern value of its assets pending a capital raise or sale. Accordingly, and pursuant to 11 U.S.C. § 363(c)(2), the Debtor requests authority to use cash collateral in accordance with the provisions of the Cash Collateral Order and Budget to pay ongoing expenses incurred in the ordinary course of its business and ongoing expenses associated with the maintenance and preservation of the Debtor's assets. These expenses include, without limitation, payroll, employee related expenses, maintenance costs, professional fees, utilities, lease expenses, taxes, and insurance.

c.      The Debtor's authority to use cash collateral is subject to compliance with the Budget, with a permitted variance of five percent (5%) per expense line item without further order of this Court, provided that total cash disbursements are not increased. The Budget may be modified with the prior written consent of Wells Fargo or by order of the Court. The duration of the approved cash collateral use will coincide with the term of the Budget as so extended with Wells Fargo's consent or by order of the Court.

d.      Pursuant to 11 U.S.C. §§ 361 and 363(e), the Debtor requests authority to provisionally grant certain adequate protection to the Lenders on account of their respective alleged prepetition liens and security interests by: (i) making provisional interest payments to Wells Fargo as set forth in the Budget; (ii) granting the Lenders valid and perfected liens on all of the Debtors' currently-owned or hereafter-acquired property and assets to the extent there is a diminution in the Lenders' prepetition collateral interests after the Petition Date (whether the reason for such diminution is as a result of, arises from, or is attributable to, the imposition of the automatic stay, the use of cash collateral or depreciation, sale, loss, or otherwise), to the same extent and in the same priority as their respective prepetition liens therein, subject only to any existing valid and perfected liens or security interests, if any, and specifically excluding any causes of action under chapter 5 of the Bankruptcy Code; and (iii) preserving the Lenders' right to seek superpriority administrative expense status under section 507(b) of the Bankruptcy Code, to the extent that the Debtor's adequate protection is insufficient.

2.     The following disclosures of certain terms contained in the Cash Collateral Order are made pursuant to Local Bankruptcy Rule 4001-2(A)(2):

      a.     **Cross Collateralization Other Than As Adequate Protection**:  No.

      b.     **Findings Regarding Validity, Perfection or Amount of Secured Creditor's Lien or Debt and Waiver of Claims Against Secured Creditor**: No.

      c.     **Waiver of Rights Under Section 506(c)**:  No.

      d.     **Liens on Chapter 5 Causes of Action**:  No.

      e.     **Immediate Roll-Up of Prepetition Debt or Use of Postpetition Loans to Pay Prepetition Debt (Other Than Under § 552(b))**:  No.

      f.     **Different Treatment of Professionals and Limit on Committee's Use of Carve-Out**:  No.

      g.     **Priming of Secured Liens Without Consent**:  No, the priority of prior liens is preserved to the extent that they are valid and enforceable.

      h.     **Declaration Against Imposition of Lender Liability**:  No.

      i.     **Relief From The Automatic Stay on An Expedited Basis and/or Without Further Order of the Court**:  No.

      j.     **Provisions for Joint and Several Liability on Loans**:  No.

3.     Pursuant to Local Rule 4001-2(A)(3), and to the extent not otherwise described herein, the following is a summary of other essential provisions of the Debtors' proposed use of cash collateral pursuant to the Cash Collateral Order:

### The Maximum Borrowing On An Interim And Final Basis

a.     This is not applicable to the Cash Collateral Order.

### The Interest Rate

b.     This is not applicable to the Cash Collateral Order.

### Maturity

c.     This is not applicable to the Cash Collateral Order.

**Events of Default**

d.      This is not applicable to the Cash Collateral Order.

**Use of Funds Limitations**

e.      Pursuant to paragraph 2 of the Cash Collateral Order, the Debtor is authorized to use cash collateral to fund expenses as set forth in the Budget.  The Budget may be modified with the prior written consent of Wells Fargo or by further order of the Court.

**Borrowing Conditions**

f.      The Debtor's use of cash collateral is conditioned upon the provisional payment of interest to Wells Fargo and the conferral of adequate protection liens pursuant to and as described in paragraph 3 of the Cash Collateral Order.

**The Budget**

g.      The Budget is attached as Exhibit A to the proposed Cash Collateral Order.

**§§ 363 and 364 Protections**

h.      *See* ¶ 1(d) *supra*.

## II.  JURISDICTION AND BACKGROUND

**A.      The Chapter 11 Filing**

4.      On December 3, 2014 (the "Petition Date"), the Debtor filed a voluntary petition in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), thereby commencing the above-captioned case ("Case"). The Debtor continues to manage and operate its businesses as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      The United States Trustee has not yet appointed a creditors' committee in the Cases.  No trustee or examiner has been appointed.

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**B.**      **The Debtor's Business and Capital Structure**

7.      GoPicnic was organized under the laws of the state of Delaware in 2011. Chicago-based GBP is a pioneer and leader in delicious, nutritionally balanced and portable ready-to-eat breakfast, lunch and snacks.  GoPicnic brands are available for a wide range of diet restrictions, including gluten free, vegetarian, vegan and kosher, and all GoPicnic meals contain no artificial colors or flavors, trans fat, high fructose corn syrup or MSG.  GoPicnic brands are available at more than 15,000 retail locations nationwide.

8.      GoPicnic's predecessor, GoPicnic, Inc. ("GPCL") was founded in 2006 by Julia Stamberger ("Stamberger").  In 2011, Stamberger caused GoPicnic to be incorporated in order to separately take ownership of what is now the GoPicnic assets and business operations. Subsequently, GoPicnic implemented a new capital structure funded by more than $3.5 million in private investment dollars (the "Capitalization Transaction").   To date, Stamberger continues to control and operate the business of GPCL.  Upon information and belief, GPCL is not a debtor under the Bankruptcy Code.

9.      The Capitalization Transaction closed in September 2012.  As a result of the Capitalization Transaction and a rights offering in mid-2014 ("2014 Rights Offering"), the principal equity holders of GoPicnic are (a) Stamberger and certain affiliated entities ("Stamberger Group"), collectively holding approximately 39% of GoPicnic's outstanding equity, (b) PCGI, holding approximately 31% of the GoPicnic's outstanding equity and (c) CWRI, holding approximately 8% of GoPicnic's outstanding equity.   The GoPicnic equity holdings of PCGI and CWRI include, collectively, approximately 80% of the outstanding shares of GoPicnic's preferred series B stock.

10.      The 2014 Rights Offering was (a) made available to all GoPicnic shareholders, (b) priced accordingly to an independent, third party appraisal of GoPicnic and (c) implemented

after the waiver of certain anti-dilution provisions.  The 2014 Rights Offering resulted in approximately $2.2 million of additional equity being invested into GoPicnic.  The equity percentages in the preceding paragraph reflect adjustments made on account of the 2014 Rights Offering.

11.     Currently, GoPicnic has a $5 million revolving loan facility with the Prepetition Lender ("Pre-Petition Facility"), which is secured by perfected, first priority liens on substantially all of GoPicnic's assets.  As of the Petition Date, the outstanding balance of the Pre-Petition Facility is approximately $2 million, and GoPicnic has little or no availability under its borrowing base formula.

12.     Previously, in December 2013, PCGI and CWRI agreed to purchase from GoPicnic secured mezzanine debt in an aggregate principal amount of $2 million (the "Mezzanine Debt").  As of the Petition Date, the outstanding balance of the Mezzanine Debt is approximately $2.3 million.  Pursuant to an August 2014 subordination agreement with Wells Fargo, the Mezzanine Debt is secured by liens on all of GoPicnic's assets that are junior to the interests of Well Fargo.

## C.     Events Leading up to the Bankruptcy

13.     Despite its strong brand recognition, GoPicnic finds itself seeking relief under chapter 11 of the Bankruptcy Code for two primary, and not entirely unrelated, reasons.

14.     First, GoPicnic has under-performed and failed to meet operational projections despite the existence of what GoPicnic believes are a solid business model and quality product.  As a result, and despite the insertion of over $5 million in equity over the past three years, GoPicnic has fallen short of its yearly projections, has experienced little to no growth in the past three years, and finds itself in need of additional liquidity.

15.     Second, GoPicnic is currently in the midst of a dispute with the Stamberger Group which arose after the GoPicnic board of directors removed Stamberger from her position as an officer and director of GoPicnic in April 2014.  Since April 2014, the Stamberger Group has demanded redemption of its equity interest in GoPicnic and additional priority payments from GoPicnic (i.e., payments with priority over the rights of the holders of the preferred series B stock).  In addition, Stamberger has threatened GoPicnic, PCGI and CWRI with claims arising out of Stamberger's removal.  GoPicnic and the Stamberger Group have engaged in discussions in an attempt to resolve Stamberger's demands.  However, in the interim, the monetary and time costs attendant to addressing Stamberger's threats have only served to exacerbate GoPicnic's current financial distress and further decreased GoPicnic's ability to obtain more liquidity outside of the bankruptcy process.

16.     As a result of these issues, GoPicnic's board of directors and management have determined that it must take immediate action to preserve GoPicnic's operations and value as a going concern.  Accordingly, in September 2014, GoPicnic retained Imperial Capital to assist it in the marketing and sale of its business.

**D.     The Debtor's Use of the Lender's Cash Collateral**

17.     Subject to the terms of the proposed Cash Collateral Order and the Budget attached thereto, the Debtor seeks authority to use of the Lenders' cash collateral.  The Debtor intends to use the cash collateral to operate its business in the ordinary course, to maintain the value of its assets as a going concern, to complete the sale process that Imperial Capital has already started and to ultimately facilitate the sale of the business by the end of January 2015.

18.     Subject to this Court's approval, the Debtor has retained professionals to assist it in achieving this goal.  Those professionals include the Debtor's bankruptcy counsel, Shaw Fishman Glantz & Towbin LLC and Imperial Capital.  Prior to the Petition Date, Imperial

Capital has received non-disclosure agreements from 13 prospective buyers and will soon be distributing a confidential information memorandum and scheduling diligence calls. In order to maintain the momentum of Imperial Capital's efforts and to avoid its professionals stopping working pending approval of their retention, the Debtor will be seeking the retention of Imperial Capital on an expedited basis pursuant to a separate motion.

### III.   REQUESTED AUTHORITY TO USE CASH COLLATERAL

19.     The Debtor seeks on an emergency basis authority to use for an interim period proceeds from accounts receivable collections and other collateral pursuant to the Cash Collateral Order and to set this matter for a final hearing on the Debtor's request to use cash collateral.

20.     Wells Fargo asserts that its claims against the Debtor is secured by first priority, non-avoidable, perfected, valid and enforceable liens on and security interests in all or substantially all of the Debtor's assets ("Cash Collateral"). Wells Fargo accordingly asserts that it holds non-avoidable, perfected, valid and enforceable security interests in the Debtor's "cash collateral" as that term is defined within the meaning of 11 U.S.C. § 363(a). PCGI and CWRI have similarly asserted that they hold non-avoidable, perfected, valid and enforceable security interests in the Debtor's "cash collateral," subject only to the senior interest of Wells Fargo.

21.     Without the ability to use Cash Collateral to pay for expenses associated with the Debtor's postpetition operations and the maintenance and preservation of their assets pending a final hearing, the going concern value of those assets will deteriorate significantly. Such interim use is necessary to avoid immediate and irreparable harm to the value of the Debtor's assets and their estates pending a final hearing. Moreover, at a final hearing, the Debtor will request that the duration of the approved cash collateral use coincide with the term of the Budget.

22.     The Debtor requires use of the Cash Collateral in order to continue its business operations and to maintain and preserve the going concern value of their assets while it continues its recapitalization and/or sale process.   Pursuant to 11 U.S.C. § 363(c)(2), the Debtor accordingly requests authority to use Cash Collateral in accordance with the provisions of the Cash Collateral Order and Budget in order to pay ongoing expenses incurred in the ordinary course of their business and ongoing expenses associated with the maintenance and preservation of the Debtor's assets pending recapitalization or their disposition through an expedited and orderly sale process conducted by Imperial Capital.

23.     Notwithstanding the Debtor's request for authority to use Cash Collateral, nothing contained in the interim Cash Collateral Order shall be deemed to constitute a determination of the validity, priority, perfection, enforceability, or unavoidability of the Lenders' purported prepetition liens or interests as the Debtor has only completed a preliminary review of those assertions and has not yet determined whether the Lenders' alleged claims and lien interests are enforceable.

24.     Provided that the Debtor (i) complies with the provisions of the Cash Collateral Order and Budget, subject to permitted variances, and (ii) provides the adequate protection contemplated therein (and as discussed in greater detail below), this Court should authorize the Debtor's use of the Cash Collateral for expenditures in accordance with the Budget.   The proposed use of Cash Collateral will adequately protect the security interests asserted by the Lenders pending a final hearing by preserving and maintaining the value of the Debtors' business operations and the Cash Collateral.  *See In re Addison Properties Ltd. P'ship*, 185 B.R. 766, 783 (Bankr. N.D. Ill. 1995) (collecting cases regarding use of cash collateral and determination of adequate protection).

25.     The Debtor believes that (i) the terms and provisions of the Cash Collateral Order are fair and reasonable under the circumstances and reflect the most favorable terms upon which the Debtor could obtain the necessary use of Cash Collateral, and (ii) the Lenders are entitled to the protections afforded under §§ 361 and 363(e) as more specifically described in paragraph 3 of the Cash Collateral Order.

## IV.  **ADEQUATE PROTECTION**

26.     Pursuant to 11 U.S.C. §§ 361 and 363(e), the Debtor requests authority to grant certain adequate protection to the Lenders on account of their respective asserted prepetition liens and security interests by provisionally paying interest to Wells Fargo and by granting the Lenders replacement liens.  Moreover, to the extent that such replacement liens and provisional interest payments do not adequately protect the Lenders from the diminution in the value of their interests in the Cash Collateral (valued as of the Petition Date), they may assert an administrative claim against the Debtor's estate under section 507(b) of the Bankruptcy Code.

27.     As more specifically set forth in paragraph 3 of the Cash Collateral Order, the Debtor proposes granting the Lenders replacement liens and security interests on all existing and hereafter acquired assets of the Debtors (excluding chapter 5 causes of action) to the same priority, validity and extent of the Lenders' respective interests in the Cash Collateral as of the Petition Date, which adequate protection liens will be subject to any other valid, enforceable and unavoidable existing liens on the Debtor's assets.

28.     Moreover, the Debtor proposes to make provisional interest payments to Wells Fargo on a monthly basis, with the first of such payments to be made during the week ending December 5, 2014 as set forth in the Budget.  The Debtor's propose paying interest on a provisional basis to Wells Fargo in the amount of $37,000 during the period covered by the Budget as additional adequate protection for its use of Wells Fargo's cash collateral.

29.     The Debtor's proposed use of Cash Collateral in accordance with the Budget is, in the Debtor's judgment, sufficient for the Debtor to satisfy its cash needs in order to maintain and preserve the value of their assets while they conduct a going concern sale process.

## V.   NOTICE

30.     Upon the Court's setting of a hearing on the First Day Motions, the Debtor will promptly provide notice to the United States Trustee, the Lenders and their counsel, and the Debtor's list of its twenty largest unsecured creditors, by fax, messenger or overnight delivery.

## VI.   EMERGENCY DESIGNATION

31.     As a result of the Debtor's immediate and ongoing need for funding to operate its business, any delay in hearing this Motion will cause serious and irreparable harm to the Debtor and the going concern value of its assets.  Therefore, the Debtor's request for an emergency hearing with respect to the interim relief in this Motion is necessary and appropriate under the circumstances.

## VII.   CONCLUSION

WHEREFORE, pursuant to 11 U.S.C. §§ 361, 363(c)(2), 363(e), Fed. R. Bankr. P. 4001(b) and 4001(d), and Local Rule 4001-2, the Debtor requests the entry of interim and final orders approving this Motion, and specifically: (i) authorizing the Debtor to use the Cash Collateral on an interim basis in accordance with the terms of the Cash Collateral Order pending a final hearing on this Motion; (ii) authorizing the Debtor to use the Cash Collateral on a final basis on substantially the same terms as the Cash Collateral Order; (iii) scheduling a final hearing on this Motion no sooner than 14 days after the entry of the interim order on this Motion or on such later date as the court's calendar permits; (iv) authorizing the Debtor to provide adequate protection in favor of the Lenders in the manner and to the extent described herein; and

(v) granting such other and further relief as is just and to which the Debtor may be entitled under

the circumstances.

Respectfully submitted,

GoPicnic Brands, Inc.

Dated: December 3, 2014

By:   /s/ Mark L. Radtke
        Proposed Counsel

Brian L. Shaw (IL ARDC 6216834)
Mark L. Radtke (IL ARDC 6275738)
David R. Doyle (IL ARDC 6303215)
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
Phone: (312) 541-0151
Fax: (312) 980-3888
bshaw@shawfishman.com
mradtke@shawfishman.com
ddoyle@shawfishman.com

*Proposed Counsel for Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 14-43382 |
| GOPICNIC BRANDS, INC., | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |

**INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL**
**AND GRANTING ADEQUATE PROTECTION**

Upon interim consideration of the motion (the "Motion") of GoPicnic Brands, Inc. (the "Debtor") requesting this Court's authorization to use the cash collateral of Wells Fargo Bank, National Association ("Wells Fargo"), Partnership Capital Growth Investors III, L.P. ("PCGI"), and (c) Clif White Road Investments, LLC ("CWRI" and collectively with Wells Fargo and PCGI, the "Lenders") pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001, on an interim basis and pending a final hearing on the Motion ("Final Hearing") pursuant to the budget attached hereto as Exhibit A ("Budget"); due and proper notice of the Motion having been given to all parties entitled thereto; a preliminary hearing having been held on the Motion pursuant to the provisions of Fed. R. Bankr. P. 4001(c)(2); sufficient cause appearing therefor; it is hereby ORDERED:

1.     The Motion is hereby granted on an interim basis and pending the Final Hearing subject to the terms and conditions set forth in this Order.

2.     The Debtor is authorized to use the Lenders' cash collateral in accordance with the Budget, with a permitted variance of five percent (5%) per expense line item provided that total cash disbursements are not increased, to pay actual, ordinary, and necessary expenses of the Debtor's business, as well as any other expenses approved by this Court.  The Budget may be modified with the prior written consent of Wells Fargo.

{11103-001 ORD A0392078.DOC}

3.      As adequate protection for any use or diminution in the value of the Lenders'

interest in the Debtor's prepetition assets ("Prepetition Collateral"), including the cash collateral

subject to the Motion, the Debtor will make provisional interest payments totaling $37,000 to

Wells Fargo during the period covered by the Budget, as set forth in the Budget, and the Lenders

are hereby granted, retroactive to the Debtor's petition date ("Petition Date") and without the

necessity of any additional documentation or filings, valid, enforceable, non-avoidable, and fully

perfected liens of the highest available priority upon (i) any property that the Debtor acquires

after the Petition Date including, without limitation, any accounts receivable generated by the

Debtor's postpetition operations, but excluding any avoidance actions under chapter 5 of the

Bankruptcy Code, and (ii) any proceeds generated from such property.  The liens granted in this

paragraph ("Adequate Protection Liens") shall be (i) limited to the extent of the aggregate

diminution subsequent to the Petition Date in the value of the Lenders' interest in the Prepetition

Collateral (including the cash collateral subject to the Motion), whether by depreciation, use,

sale, loss, or otherwise, and (ii) subject only to prior perfected and unavoidable liens in property

of the Debtor's estate as of the Petition Date.  The grant of adequate protection provided herein is

without prejudice to the Lenders' right to seek additional adequate protection of their interests in

the Debtor's property.

4.      The provisional interest payments to Wells Fargo and the Adequate Protection

Liens granted to the Lenders will secure payment of their prepetition secured claims in an

amount equal to the aggregate diminution, from and after the Petition Date, of the value of the

Lenders' interest in prepetition collateral as a consequence of the Debtor's use or otherwise.  By

virtue of 11 U.S.C. § 507(b), the Lenders may also assert superpriority administrative expense

status to the extent that the Debtor's adequate protection is insufficient.

5.      This Order shall be sufficient and conclusive evidence of the validity,

enforceability and perfection of the Adequate Protection Liens, whether or not the Lenders elect

to file or record financing statements, any other documents, or to take such other steps as may

otherwise be required to obtain, evidence or perfect such liens under applicable law; and the

Lenders may, in their sole discretion, but shall not be required to, file a certified copy of this

Order in any filing or recording office in any jurisdiction in which the Debtor has property, and

such filing or recording shall be accepted and shall constitute further evidence of perfection of

their liens and security interests.

6.      The entry of this Order is without prejudice to the Debtor's right to seek authority

to use additional cash collateral or borrow funds pursuant to 11 U.S.C. § 364 if the Debtor

determines that the cash collateral use authorized by this Order is insufficient.

7.      The Motion is hereby set for a Final Hearing before this Court at _____ _.m.

**on** _____ (such date or such later date to which the final hearing is

adjourned or continued, the "Final Hearing Date"), at which time any party in interest may

present any timely filed objections to the entry of a final order ("Final Order") in the form of,

and containing relief substantially similar to, this Order.  The Debtor shall promptly serve a

notice of the Final Hearing, together with a copy of this Order, by regular mail upon (i) the

Office of the United States Trustee, (ii) the creditors holding the 20 largest unsecured claims

against the Debtor, (iii) any known holders of prepetition liens against the Debtor's property, and

(iv) any other party which has filed a request with this Court for notice in the Debtor's case and

served such request upon the Debtor's counsel.  The notice of the Final Hearing shall state that

objections to the entry of a Final Order on the Motion shall be in writing and shall be filed with the United States Bankruptcy Clerk for the Northern District of Illinois no later than _____, **2014** which objections shall be served so that the same are received on or before 4:00 p.m. (Central time) of such date by (i) counsel to the Debtor, Brian L. Shaw, Mark L. Radtke, Shaw Fishman Glantz & Towbin LLC, 321 N. Clark Street, Suite 800, Chicago, Illinois 60654, bshaw@shawfishman.com, mradtke@shawfishman.com, (ii) counsel to the Lenders, (iii) counsel for any official committee, and (iv) the Office of the United States Trustee.   Any objections by creditors or other parties in interest to any of the provisions of this Order shall be deemed waived unless filed and served in accordance with this paragraph.

8.      The Debtor's authority to use the Lenders' cash collateral under this Order shall be effective immediately and shall extend through the Final Hearing Date unless subsequently extended by written agreement of the Debtor and the Lenders.

Dated:  December ___, 2014                    **ENTER:**


_____
United States Bankruptcy Judge

*Prepared By*:

Brian L. Shaw (IL ARDC 6216834)
Mark L. Radtke (IL ARDC 6275738)
David R. Doyle (IL ARDC 6303215)
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
Phone: (312) 541-0151
Fax: (312) 980-3888
bshaw@shawfishman.com
mradtke@shawfishman.com
ddoyle@shawfishman.com

*Proposed Counsel for Debtor*

# EXHIBIT A

# Cash Collateral Model

'(000's)

|  | Assumptions | 12/5 Total Wk 1 | 12/12 Total Wk 2 (Payroll) | 12/19 Total Wk 3 | 12/26 Total Wk 4 (Payroll) | 1/2 Total Wk 5 | 1/9 Total Wk 6 (Payroll) | 1/16 Total Wk 7 | 1/23 Total Wk 8 (Payroll) | 1/30 Total Wk 9 | 2/6 Total Wk 10 (Payroll) | 2/13 Total Wk 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Disbursements:** | | | | | | | | | | | | |
| Add: Advances for outstanding cks / CRITICAL production vendors | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NetSuite (NS) ERP license $11,653 qrtly | 12/14 | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NS Website sandbox lic. $2,331 qrtrly | 12/14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent - Ravenswood ($9,330) | 1st | 0 | 0 | 0 | 0 | 9 | 9 | 0 | 0 | 0 | 9 | 0 |
| Rent - Schiller Park whse ($8,525) | 1st | 9 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 9 | 0 |
| Rent - Schiller Park office ($4,933 on Jan 1) | 1st | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 | 5 | 0 |
| Rent - Schiller Park office ($6,500 sec. dep.) | 1st | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BCBS Medical Insurance | 1st | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 0 | 15 | 0 |
| Wells Fargo ABL LOC interest | 1st | 13 | 0 | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 12 | 0 |
| Utilities - Whse & Office $3K | 1st | 2 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 3 | 0 |
| Oper Leases - Forklift & Copier (Wells) | 1st | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 |
| Office Phone & Internet $1.5K | 1st | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 |
| Business Insurance $42K pd monthly | EOM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Broker commission fees - avg $17K | EOM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Prof Svc - Marketing $8K | EOM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Recall Insurance $20K pd monthly | ACH 18th | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| D&O - EPL Insurance $12K pd monthly | ACH 18th | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Acctg Review $23K (No) & Tax Returns $20K (Yes) | April 15th | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payroll, Taxes & 401K Match | bi-wkly 11/28 | 0 | 65 | 0 | 50 | 0 | 50 | 0 | 50 | 0 | 50 | 0 |
| Trade Shows - N/A | N/A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Marketing Materials - N/A | N/A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IT & Phone Installs / Support | Periodic | 11 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| Employee Expenses $4K per week | Weekly | 8 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 0 |
| Federal Express & LTL Carriers | Weekly | 18 | 12 | 10 | 12 | 12 | 10 | 12 | 12 | 10 | 15 | 0 |
| Inventory & Co-Packers (COGS) | Weekly | 104 | 117 | 79 | 124 | 86 | 122 | 128 | 129 | 132 | 138 | 0 |
| Packaging, Office Supplies, Postage $92K | Weekly | 4 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 0 |
| Administrative & Legal Expenses $200K over 8 wks | Weekly | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 0 | 0 | 0 |
| **Total Cash Disbursements** | | 198 | 244 | 127 | 224 | 150 | 253 | 177 | 230 | 157 | 270 | |

**Cash Collateral Budget**

|  | Assumptions | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Receipts | | 384 | 656 | 76 | 86 | 110 | 116 | 132 | 148 | 160 | 171 | |
| Less: Cash Disbursements | | (198) | (244) | (127) | (224) | (150) | (253) | (177) | (230) | (157) | (270) | |
| Cash Balance (Deficit) - Week to Date | | 186 | 412 | (51) | (138) | (40) | (137) | (45) | (82) | 3 | (99) | (3) |
| Cash Balance (Deficit) - Period to Date | | 186 | 598 | 547 | 409 | 369 | 232 | 187 | 105 | 108 | 9 | 6 |
| Accounts Receivable - ending balance | | 1,080 | 455 | 517 | 657 | 694 | 794 | 886 | 961 | 1,027 | 1,092 | 1,144 |
| Inventory - ending balance | | 2,600 | 2,579 | 2,596 | 2,526 | 2,533 | 2,503 | 2,465 | 2,430 | 2,397 | 2,356 | 2,394 |