IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 14-43382 |
| GOPICNIC BRANDS, INC., | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |

**FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL**
**AND GRANTING ADEQUATE PROTECTION**

Upon final consideration of the motion (the "Motion") of GoPicnic Brands, Inc. (the "Debtor") requesting this Court's authorization to use the cash collateral of Wells Fargo Bank, National Association ("Wells Fargo"), Partnership Capital Growth Investors III, L.P. ("PCGI"), and (c) Clif White Road Investments, LLC ("CWRI"; and collectively with Wells Fargo and PCGI, the "Lenders") pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001, and pursuant to the budget attached hereto as Exhibit A (as the same may be modified from time to time in accordance with Paragraph 2 of this Order, the "Budget"); due and proper notice of the Motion having been given to all parties entitled thereto; preliminary hearings having been previously held on the Motion pursuant to the provisions of Fed. R. Bankr. P. 4001(c)(2); having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion, and having now completed a final hearing pursuant to Code § 363 and Fed. R. Bankr. P. 4001(b) and (d), and objections, if any, having been withdrawn, resolved or overruled by the Court, **THE COURT HEREBY FINDS THAT:**

A. On December 3, 2014 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., the "Code"). Debtor has retained possession of its property and continues to operate its business as debtor in possession pursuant to Code §§ 1107 and 1108.

B. The Court has jurisdiction over the Case and this proceeding under 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C. On December 8, 2014, the Court entered the Emergency Order Authorizing Use of Cash Collateral and Granting Adequate Protection (D.I. 23, "Emergency Order").

D. On December 11, 2014, the Court entered the Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection (D.I. 27, "Interim Order").

E. On December 15, 2014, an official creditors' committee was appointed to represent unsecured creditors in this Case pursuant to Code § 1102 (any such official committee, "Committee").

F. Debtor has a $5 million revolving loan facility with Wells Fargo pursuant to a Credit Agreement dated as of August 13, 2014, by and between Debtor and Wells Fargo, as amended or otherwise modified from time to time (the "Credit Agreement"), and other "Loan Documents" (as that term is defined in the Credit Agreement) (collectively, the "Prepetition Documents"). All indebtedness or obligations under the Prepetition Documents as of the Petition Date, including, without limitation, all "Obligations" (as defined in the Credit Agreement), and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Documents under Code § 506(b) are collectively referred to herein as the "Prepetition Debt".

G. Subject to Paragraph 7 of this Order, Debtor hereby admits, stipulates and agrees that:

    a. the Prepetition Documents are valid and enforceable and evidence and govern (i) the Prepetition Debt, (ii) the asserted security interests and liens of Wells Fargo in "Collateral" (as that term is defined in that certain Security

Agreement dated as of August 13, 2014, by and between Debtor and Wells Fargo) existing as of the Petition Date and all proceeds, rents, issues, profits and products thereof (collectively, the "Prepetition Collateral"; the Prepetition Collateral and all Replacement Lien Collateral (as defined below) subject to the Wells Fargo Replacement Liens are hereinafter collectively referred to as the "Wells Fargo Aggregate Collateral"), and (iii) the prepetition financing relationship between Debtor and Wells Fargo;

b. the Prepetition Debt constitutes the legal, valid and binding obligation of Debtor, enforceable in accordance with the terms of the Prepetition Documents;

c. as of the Petition Date, Debtor is liable for payment and performance of the Prepetition Debt, and the Prepetition Debt is an allowed secured claim in an amount not less than $1,947,931.33, exclusive of accruing attorneys' fees, interest and other costs;

d. no offsets, defenses or counterclaims to the Prepetition Debt exist, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, applicable non-bankruptcy law or otherwise;

e. the liens and security interests of Wells Fargo in the Prepetition Collateral (collectively, the "Prepetition Liens") are first priority, properly perfected, valid and enforceable security interests, that are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and that are

otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable non-bankruptcy law, subject only to any liens of third parties (other than PCGI and CWRI) upon the Prepetition Collateral, which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date (any such third party liens, together with the Financial Advisor Carveout (as defined in Paragraph 15 of this Order), being, collectively, "Permitted Priority Liens");

  f. Debtor does not have, and hereby releases, and is forever barred from bringing or asserting any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Debt, against Wells Fargo and its affiliates, subsidiaries, agents, officers, directors, shareholders, members, managers, employees, representatives, attorneys, advisors, consultants, predecessors in interest, successors and assigns; and,

  g. for purposes of Code §§ 506(c) and 507(b) under this Order, the value of the Prepetition Collateral as of the Petition Date was not less than the Prepetition Debt.

 H. All cash and cash equivalents of the Debtor are Prepetition Collateral or proceeds thereof. The Debtor acknowledges that these funds constitute "cash collateral" of Wells Fargo (the "Cash Collateral") within the meaning of 11 U.S.C. § 363(a).

I. Lenders are entitled to adequate protection as set forth herein pursuant to Code §§ 361 and 363 for any decrease in the value of such interests in the Prepetition Collateral from and after the Petition Date.

J. The Debtor has requested that the Lenders consent to the Debtor's use of the Cash Collateral in order to provide funds to be used in the operation of the Debtor's business. If the Debtor's business were to cease operations, the Debtor and its creditors, including employees, would suffer irreparable harm.

K. Subject to the terms and conditions set forth in this Order, and with the express understanding that the Debtor intends to promptly seek authority to sell substantially all of its assets outside the ordinary course of business pursuant to 11 U.S.C. § 363(b) by January 31, 2015 (the "Sale"), to file a procedures motion for the Sale, and to pay all amounts that are due and owing to Wells Fargo at closing of the Sale, including the Prepetition Debt plus postpetition interest, attorneys' fees and costs incurred by Wells Fargo, Wells Fargo is willing to consent to the entry of this Order. Nothing contained in this Order shall or shall be construed to waive, impair, limit or prejudice in any way Wells Fargo's rights to contest or object to any further or other use of the Cash Collateral by the Debtor.

L. The terms of this Order have been negotiated at arm's length and in good faith.

M. Under the circumstances of this Case, this Order is a fair and reasonable response to Debtor's request for Lenders' consent to the use of Cash Collateral, and the entry of this Order is in the best interest of Debtor's estate and its creditors.

N. The notice provided by Debtor of the Motion, the hearing on the Motion, and the entry of this Order satisfy the requirements of Fed. R. Bankr. P. 2002, 4001(b) and (d), and 9014,

and Code §§ 102(1) and 363 and were otherwise sufficient and appropriate under the circumstances.

O.  This Order constitutes findings of fact and conclusions of law under Fed. R. Bankr. P. 7052 and will take effect and be fully enforceable as of the Petition Date.

**IT IS HEREBY ORDERED THAT:**

1.  The Motion is hereby granted on a final basis, subject to the terms and conditions set forth in this Order.

2.  Through the earlier to occur of (a) the date on which Wells Fargo provides notice (via email, facsimile, or courier) to the Debtor's counsel, the Office of the United States Trustee, and counsel for the Committee, of the occurrence of an "Event of Default" (as defined below), (b) the closing of any Sale of all, or substantially all, of Debtor's assets, and (c) February 13, 2015 (the "Termination Date"), the Debtor is authorized to use Cash Collateral pursuant to this Order in accordance with the Budget, with a permitted variance of five percent (5%) per expense line item, to pay the operating expenses specified in the Budget when the same are due and payable, subject to Paragraph 7 of this Order, and to pay the following professional fee retainers specified in the Budget (when, in the Debtor's business judgment it is able to pay the following retainers without a material disruption to, or threatening to materially disrupt, its operations, and after the retention of such professional is approved by the Court) an aggregate $50,000 retainer to Shaw Fishman Glantz & Towbin LLC (as counsel for the Debtor, "SFG&T"), a $30,000 retainer to Freeborn & Peters LLP (as counsel for the Committee, "Committee Counsel"), and a $20,000 retainer to Synergy Law Group (as special corporate counsel for the Debtor, "Synergy"). The Budget may be modified with the prior written consent of Wells Fargo and prior notice to

counsel for the Committee, without further order of the Court. In addition, the Debtor is authorized to make the payments of Cash Collateral consisting of proceeds of "Excess Inventory" (defined below) that are contemplated by Paragraphs 10(e) and (f). For the avoidance of doubt, the occurrence of the Termination Date described above does not prohibit the Debtor's right to request the use of Cash Collateral (other than with respect to the Unavailable Cash Collateral) after the Termination Date in accordance with Paragraph 9 of this Order.

3.  <u>Procedure for Use of Cash Collateral</u>. Debtor will deliver all Cash Collateral now or hereafter in its possession or control to Wells Fargo promptly upon receipt thereof. Wells Fargo is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and any other forms of payment now or hereafter coming into its possession or control that constitute Cash Collateral or proceeds thereof, and otherwise administer such amounts in accordance with this Order. Through the Termination Date, Wells Fargo is authorized and directed to remit such Cash Collateral it has received after the Petition Date to Debtor (other than $50,000 of Cash Collateral in Wells Fargo's possession as of the date of this Order and all proceeds of Excess Inventory (defined below), collectively, the "<u>Unavailable Cash Collateral</u>") to the extent and when Debtor is permitted to use the same in accordance with Paragraph 2 of this Order (notwithstanding any prior provisional application of such Cash Collateral to the Prepetition Debt). Subject to Paragraph 9 of this Order, all Cash Collateral not required to be remitted by Wells Fargo to the Debtor pursuant to the foregoing sentence shall be applied by Wells Fargo to the Prepetition Debt in the following order: (a) first, to principal amounts of the Prepetition Debt; and (b) second, to amounts allowable under Code § 506(b).

Case 14-43382 Doc 60 Filed 12/22/14 Entered 12/22/14 17:04:40 Desc Main
Document Page 8 of 19

4. As adequate protection for any use or diminution (whether by depreciation, use, sale, loss, or otherwise) in the value of each Lenders' respective interest in the Prepetition Collateral (including, without limitation, the Cash Collateral), each of the Lenders are hereby separately granted, retroactive to the Petition Date and without the necessity of any additional documentation or filings, valid, enforceable, non-avoidable, and fully perfected liens upon all property of the Debtor (other than any avoidance actions under chapter 5 of the Bankruptcy Code) and all products, proceeds, rents, issues and profits thereof (collectively, the "Replacement Lien Collateral"). Such liens of Wells Fargo on the Replacement Lien Collateral (the "Wells Fargo Replacement Liens") shall be first priority liens but subject to only its Prepetition Liens and any Permitted Priority Liens. Such liens of PCGI and CWRI on the Replacement Lien Collateral shall be junior and subordinated in all respects to the Wells Fargo Replacement Liens, the Prepetition Liens of Wells Fargo and any Permitted Priority Liens.

5. As further adequate protection of Wells Fargo's interests:

(a) In addition to continuing to provide Wells Fargo and counsel for the Committee with all reports the Debtor is required to provide under the Prepetition Documents, the Debtor shall provide to Wells Fargo on each Tuesday through the Termination Date, a report, in form and substance satisfactory to Wells Fargo, reconciling Debtor's actual performance (including, without limitation, Debtor's actual collections, sales, disbursements, and credit memos and accounts receivable deductions) for the week ended on the preceding Friday with the Debtor's projected performance for such week in the Budget and detailed explanations for any variances arising with respect to such weekly reports, and shall timely file its monthly operating reports; provided, that Debtor acknowledges and agrees that the daily collateral report to be delivered by Debtor to Wells Fargo under subsection (a) of Schedule D of the Credit Agreement will be delivered in form and substance acceptable to Wells Fargo on each business day through the Termination Date;

(b) The Debtor shall maintain and keep the Replacement Lien Collateral in good condition, repair and working order (normal wear and tear excepted);

  (c) The Debtor shall maintain all insurance that existed as of the Petition Date with respect to the Debtor's business and the Replacement Lien Collateral; and

  (d) The Debtor shall only use the Replacement Lien Collateral for lawful purposes, without violation of any federal, state or local law, statute or ordinance.

The grant of adequate protection provided herein is without prejudice to the Lenders' right to seek additional adequate protection of their interests in the Debtor's property at any time.

  6. If and to the extent the adequate protection of the interests of Wells Fargo in the Prepetition Collateral granted pursuant to this Order proves insufficient, Wells Fargo will have an allowed claim under Code § 507(b) in the amount of any such insufficiency, with priority over the claims of any other party in interest under Code § 507(b).

  7. <u>Challenges Regarding Wells Fargo Liens and Claims.</u>

  (a) The Debtor's stipulations and representations contained in this Order will be binding on all parties in interest, unless and solely to the extent that (1) Debtor receives written notice of a potential claim or cause of action challenging the extent, validity, perfection, priority or enforceability of the Prepetition Debt, the Prepetition Liens or any other claims or causes of action against Wells Fargo (a "<u>Challenge</u>"), during the period from the Petition Date until the date that is the earlier of February 13, 2015, or the date on which a hearing to approve the sale of all or substantially all of the Debtor's assets concludes (the "<u>Investigation Period</u>") from any party in interest and (2) the Court rules in favor of the plaintiff in respect of any such timely and properly filed Challenge.

  (b) During the Investigation Period, a party in interest must notify the Debtor of its good faith demand that the Debtor initiate an action or adversary proceeding on a specific Challenge. From the date that Debtor is so notified, the Debtor will have five (5) days to notify such party of whether or not the Debtor intends to initiate such action and ten (10) days to initiate any such action. If the Debtor notifies such party that the Debtor does not intend to initiate an action or adversary proceeding, such party will have ten (10) days from the receipt of such notice to initiate an action or seek derivative standing in respect of such Challenge. Nothing herein will be deemed to grant standing in favor of any party. Debtor, if timely notified in writing of a potential Challenge, will retain authority to prosecute, settle or compromise such Challenge at any time in the exercise of its business judgment and subject to any applicable further order of court.

  (c) If the Debtor does not receive notice of a potential Challenge during the Investigation Period, or a commenced Challenge is denied, without further order of the Court, (1) the Prepetition Debt and Prepetition Liens of Wells Fargo will be deemed to be allowed for all purposes in this Case and will not be subject to challenge by any party in interest as to extent,

validity, priority or otherwise, and (2) the Debtor and its estate will be deemed to have waived, released and discharged Wells Fargo and its affiliates, subsidiaries, agents, officers, directors, managers, principals, members, employees, attorneys, advisors, consultants, legal representatives, other representatives, predecessors in interest, successors and assigns, of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the expiration of the Investigation Period with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise.

8. Other than with Wells Fargo's consent, the Debtor is prohibited from seeking to use or using additional Cash Collateral prior to the Termination Date. The Debtor is also prohibited from seeking to incur or incurring debt pursuant to 11 U.S.C. § 364 at any time prior to the Termination Date.

9. Unless otherwise ordered by the Court, the Debtor's authority to use the Cash Collateral pursuant to this Order shall automatically terminate on the Termination Date, without further action by Wells Fargo and unless subsequently extended by written agreement of the Debtor and Wells Fargo. In addition, on the Termination Date, Wells Fargo and Debtor will be entitled to apply to this Court for all appropriate relief on expedited notice, with twenty-four (24) hours' notice to the Debtor, Committee, Wells Fargo, and the United States Trustee of such expedited hearing being sufficient, subject to availability of the Court; provided, that: (1) the obligations of the Debtor and the rights of the Lenders with respect to all transactions which have occurred prior to the Termination Date shall remain unimpaired and unaffected; and (2) the Debtor and the Lenders shall retain all of their respective rights and remedies under this Order and the Code, including, without limitation, the Debtor's right to request the continued use of Cash Collateral (other than with respect to the Unavailable Cash Collateral) and Wells Fargo's right to oppose the Debtor's further use of Cash Collateral; provided, further, that, during the five (5) business day period following the occurrence of the Termination Date, if the Debtor has sought such expedited relief to continue using Cash Collateral, the Debtor may use Cash

Collateral after the Termination Date solely to pay amounts due to employees for postpetition services rendered through the Termination Date.

10.    For purposes of this Order, an "Event of Default" shall mean any of:

(a)    The violation or breach by the Debtor of any of the covenants, agreements, or other terms of this Order;

(b)    If, for the periods commencing on December 13, 2014 and ending on each of December 26, 2014 and January 2, 2015, (1) the Debtor's actual collection of accounts are less than ninety percent (90%) of projected collections in the Budget for such period; (2) Debtor's actual sales are less than one hundred percent (100%) of projected sales in the Budget for such period; or (3) the Debtor's credit memos and accounts receivable deductions are more than one hundred twenty percent (120%) of projected deductions for such period.

(c)    If, for the periods commencing on December 6, 2014 and ending on January 9, 2015 and on each Friday thereafter in the Budget, (1) the Debtor's actual collection of accounts are less than sixty percent (60%) of projected collections in the Budget for such period; (2) Debtor's actual sales are less than eighty percent (80%) of projected sales in the Budget for such period; or (3) the Debtor's credit memos and accounts receivable deductions are more than one hundred twenty percent (120%) of projected deductions for such period.

(d)    If, on or before January 9, 2015, the Debtor shall have failed to obtain one or more binding purchase orders (in form and substance acceptable to Wells Fargo, including, without limitation, as to net price) for certain of the Debtor's excess inventory (collectively, the "Excess Inventory"), with the aggregate net purchase price of such purchase order(s) being not less than $50,000.

(e)    On or before January 16, 2015, the Debtor fails to (i) consummate one or more sales of Excess Inventory, and (ii) remit not less than $50,000 of proceeds of such Excess Inventory to Wells Fargo to be applied to the Prepetition Debt in accordance with Paragraph 3 of this Order.

(f)    If the Debtor fails to (i) use commercially reasonable best efforts to promptly dispose of all Excess Inventory and (ii) remit the proceeds thereof to Wells Fargo on the same basis as provided in Section 10(d) above.

(g)    The entry of an order converting the Case to a case under chapter 7 of the Code or terminating the authority of the Debtor to operate its business;

(h)    The termination, expiration, lapse, or reduction of insurance coverage that is continuing on the Replacement Lien Collateral for any reason whatsoever;

(i)    The Debtor's failure to pay, when due, any postpetition taxes;

11

(j)     The appointment of a trustee in this Case;

(k)     The entry of any order authorizing any party in interest to reclaim any of the Wells Fargo Aggregate Collateral, granting any party in interest relief from the automatic stay with respect to any of the Wells Fargo Aggregate Collateral, or requiring that Debtor turnover any of the Wells Fargo Aggregate Collateral, in each case, other than in respect of any property of the Debtor in which there is no existing equity after accounting for any Permitted Priority Liens therein;

(l)     The Debtor's failure to continue to retain and engage, at all times through the Termination Date, Howard Korenthal (or another individual acceptable to Wells Fargo) on substantially the same terms and provisions of the engagement of Howard Korenthal that have been concurrently approved by order of the Court.

(m)     The Debtor, without the written consent of Wells Fargo (not to be unreasonably withheld), seeks to conduct a Code § 363 sale on terms unacceptable to Wells Fargo or files a chapter 11 plan that does not provide for full and final payment of the Prepetition Debt on the effective date of such plan;

(n)     The Debtor, without the written consent of Wells Fargo (not to be unreasonably withheld), moves or otherwise seeks to modify its bidding procedures relating to the Sale that have been approved by order of the Court on the date hereof;

(o)     The Debtor does not receive any qualified bid by January 26, 2015 and, again, at any Sale auction in accordance with such bidding procedures that would result in the repayment of the Prepetition Debt in full in cash on or before February 13, 2015;

(p)     The Debtor's failure to conduct one or more auctions in accordance with such bidding procedures on or before February 2, 2015;

(q)     The Debtor's failure to obtain, on or before February 3, 2015, one or more orders of the Court approving the Sale of all, or substantially all, of Debtor's assets, which order shall be in form and substance reasonably satisfactory to Wells Fargo; and

(r)     The Debtor, without the written consent of Wells Fargo, withdraws its request to conduct, or otherwise cancels, the Sale.

11.     Matters Affecting Collateral.

(a)     Access to Collateral. Upon written notice to the landlord of any of the Debtor's leased premises that the Termination Date has occurred, Wells Fargo may enter upon such leased premises for the purpose of exercising any right or remedy with respect to the Wells Fargo Aggregate Collateral located thereon and shall be entitled to the Debtor's rights and privileges under such lease(s) without interference from such landlord; provided, however, that, to the extent the Debtor has not already paid rent for such period, Wells Fargo shall pay to such

landlord rent first accruing after the above-referenced written notice and during the period of occupancy by Wells Fargo, calculated on a per diem basis at the non-default rate.

(b) <u>No Surcharge</u>. The Debtor represents that the Budget (as defined and set forth herein and in the Emergency Order and the Interim Order) contains all expenses that are reasonable and necessary for the operation of Debtor's business and the preservation of the Wells Fargo Aggregate Collateral through the period for which the Budget runs, and therefore includes any and all items potentially chargeable to Wells Fargo under Code § 506(c). Therefore, in the exercise of its business judgment, the Debtor covenants and agrees that it will not seek to surcharge any of the Wells Fargo Aggregate Collateral for any purpose unless expressly agreed to in writing by Wells Fargo, and the Debtor, on behalf of the estate, will be deemed to have waived any rights, benefits, or causes of action under Code § 506(c), the enhancement of collateral provisions of Code § 552, or the doctrine of unjust enrichment as they may relate to, or be asserted against, Wells Fargo or any of the Wells Fargo Aggregate Collateral.

12. <u>Waiver of Right to Return; Consent to Setoff</u>. Without Wells Fargo's prior written consent the Debtor will not (a) return any of the Wells Fargo Aggregate Collateral pursuant to Code § 546(h), (b) consent to any order permitting any claims pursuant to Code § 503(b)(9), or (c) consent to setoff pursuant to Code § 553.

13. <u>Force and Effect of Prepetition Documents</u>. Except as modified herein and subject to the other provisions of this Order and the Code, the Prepetition Documents will remain in full force and effect with respect to the Prepetition Debt. To the extent that there exists any conflict among the terms of the Motion, the Prepetition Documents, the Emergency Order, the Interim Order, and this Order, this Order governs and controls. Without limiting the foregoing, each Subordination Agreement (as defined below) is and will remain valid and binding upon the Subordinated Creditors (as defined below) party thereto notwithstanding the entry of this Order, constitutes a "subordination agreement" within the meaning of Code § 510, is enforceable in accordance with its terms, and Wells Fargo's consent to the entry of this Order will not prejudice Wells Fargo's rights under any Subordination Agreement. For purposes hereof, "<u>Subordination Agreement</u>" means and refers to each of (a) that certain Subordination Agreement (Debt and Security Interest), dated as of August 13, 2014, made by CWRI and PCGI in favor of Wells

Fargo, as acknowledged and agreed to by Debtor and as amended or otherwise modified from time to time, and (b) that certain Subordination Agreement (Unsecured Debt), dated as of August 13, 2014, made by Plan-It Earth LLC in favor of Wells Fargo, as acknowledged and agreed to by Debtor and as amended or otherwise modified from time to time. In addition, for purposes hereof, "Subordinated Creditor" means and refers to each of CWRI, PCGI, and Plan-It Earth LLC.

14. <u>Audits, Inspections, Etc.; Access</u>. The Debtor covenants and agrees to cooperate fully in connection with any audit, inspection, valuation, or appraisal that Wells Fargo may cause to be conducted from time to time in its discretion upon reasonable prior notice to the Debtor, including, without limitation, by providing Wells Fargo and its agents with reasonable access to Debtor's premises, books and records, Wells Fargo Aggregate Collateral, and Debtor's officers, employees, and other agents and representatives.

15. <u>Carveout</u>.

(a) <u>Certain Defined Terms</u>. For purposes of this Order, the following defined terms have the respective meanings given to them below:

(1) "<u>Carveout</u>" means, with respect to (A) Debtor Counsel and Committee Counsel, the allowed fees and disbursements of such Carveout Professionals from time to time pursuant to Code § 330, in the aggregate amount set forth in this Paragraph 15, payable under and pursuant to the Termination Date Carveout (as defined below), and (B) MorrisAnderson, the fees and disbursements of MorrisAnderson from time to time in the aggregate amount set forth in this Paragraph 15, payable under and pursuant to the Financial Advisor's Carveout (defined below).

(2) "<u>Carveout Professionals</u>" means, collectively, SFG&T and Synergy (collectively, "<u>Debtor Counsel</u>"), Committee Counsel, and MorrisAnderson & Associates, Ltd., as the Debtor's financial advisor ("<u>MorrisAnderson</u>").

(b) <u>Financial Advisor's Carveout</u>. The "<u>Financial Advisor's Carveout</u>" with respect to MorrisAnderson: (1) equals an aggregate amount not to exceed the lesser of (A) the aggregate amount provided in the Budget for MorrisAnderson in respect of the Financial Advisor's Carveout for the period commencing on the Petition Date and ending on the Termination Date and (B) the aggregate amount of the fees and expenses of MorrisAnderson that

accrue during the period commencing on the Petition Date and ending on the Termination Date; (2) is reduced dollar-for-dollar by any payment of fees and expenses to MorrisAnderson; and (3) must be paid out of any prepetition retainer or property of Debtor's estate (other than property subject to an unavoidable lien in favor of Wells Fargo) before such payments are made from proceeds of any Wells Fargo Aggregate Collateral. Except as set forth in this Paragraph 15(b), Wells Fargo has no obligation to fund any fees, expenses, or disbursements of any Carveout Professional.

(c) **Termination Date Carveout.** The "Termination Date Carveout" with respect to: (1) Debtor Counsel equals $275,000 and (2) Committee Counsel equals $175,000, and, in each case, is and will be payable on or after the Termination Date solely from the proceeds of Aggregate Collateral sold prior to the Termination Date, if and after the Prepetition Debt has been paid in full, in cash, and on a final and indefeasible basis.

(d) **Carveout Usage.** No portion of any Carveout, and no Cash Collateral or Wells Fargo Aggregate Collateral, may be used to pay any fees, costs, or expenses incurred by any person or entity, including, without limitation, the Debtor, any Committee, or any Carveout Professional, in connection with any claims or causes of action adverse to Wells Fargo's interests in the Wells Fargo Aggregate Collateral, including, without limitation, (1) preventing, hindering, or delaying Wells Fargo's enforcement or realization upon any of the Wells Fargo Aggregate Collateral once the Termination Date has occurred, (2) using or seeking to use any Cash Collateral or incurring any indebtedness in violation of the terms hereof, or selling or otherwise disposing of any Wells Fargo Aggregate Collateral without Wells Fargo's prior written consent, or (3) objecting to, or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of the Prepetition Debt or any mortgages, liens, or security interests with respect thereto or any other rights or interests of Wells Fargo, or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Code, against Wells Fargo; provided, however, that the Carveout may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation, and entry of this Order or any amendment hereto consented to by Wells Fargo; provided, further, that up to $10,000 of the Committee's retainer may be used to satisfy fees and expenses incurred by counsel for the Committee to investigate potential Challenges against Wells Fargo.

16. **General Relief.**

(a) Neither Wells Fargo nor any of the Wells Fargo Aggregate Collateral shall be subject to the doctrine of marshaling.

(b) To the extent there exists any conflict among the Motion, the Prepetition Documents, the Emergency Order, the Interim Order, and the terms of this Order, this Order shall govern and control.

(c) The automatic stay of Code § 362 is hereby modified to the extent necessary to effectuate the provisions of this Order.

(d) Wells Fargo will not be deemed to have suspended or waived any of its rights or remedies under this Order, the Prepetition Documents, the Code, or applicable non-bankruptcy law unless such suspension or waiver is hereafter made in writing, signed by a duly authorized officer of Wells Fargo, as applicable, and directed to Debtor. No failure of Wells Fargo to require strict performance by Debtor (or by any Trustee) of any provision of this Order will waive, affect or diminish any right of Wells Fargo thereafter to demand strict compliance and performance therewith, and no delay on the part of Wells Fargo in the exercise of any right or remedy under this Order, the Prepetition Documents or applicable non-bankruptcy law will preclude the exercise of any right or remedy. Further, this Order does not constitute a waiver by Wells Fargo of any of its rights under the Prepetition Documents, the Code or applicable non-bankruptcy law, including, without limitation, Wells Fargo's right to later assert (1) that any of its interests in the Wells Fargo Aggregate Collateral lack adequate protection within the meaning of Code §§ 362(d) or 363(e) or any other provision thereof or (2) a claim under Code § 507(b).

(e) Except as provided in Paragraph 7 of this Order, this Order is binding on all parties in interest in the Case and their respective successors and assigns, including, without limitation, any subsequently appointed chapter 11 or chapter 7 trustee of the Debtor ("Trustee"), except that any Trustee will have the right to terminate this Order after notice and a hearing, subject to the terms and conditions of this Order. If this Order does not become a final non-appealable order, if a Trustee terminates this Order, or if any of the provisions of this Order are hereafter modified, amended, vacated, or stayed by any subsequent order of this Court or any other court, such termination or subsequent order shall not affect: (1) subject to Paragraph 7 of this Order, the stipulations, representations, and findings contained in this Order and the relief granted by, and the releases contained in, this Order; and (2) the priority, validity, enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby with respect to Cash Collateral used prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits will be governed in all respects by the original provisions of this Order.

(f) Without Wells Fargo's written consent, the terms and provisions of Paragraphs G and 7 of this Order, and any actions taken pursuant to or in reliance upon the terms hereof, will survive entry of, and govern in the event of any conflict with, any order which may be entered in the Case.

17. The Debtor shall promptly serve a notice of the entry of this Order, together with a copy of this Order, by regular mail upon (i) the Office of the United States Trustee, (ii) counsel for the Committee, (iii) the creditors holding the 20 largest unsecured claims against the Debtor, (iv) any known holders of prepetition liens against the Debtor's property, and (iv) any other party which has filed a request with this Court for notice in the Debtor's case and served such request upon the Debtor's counsel.

Dated: December ___, 2014

22 DEC 2014

ENTER:

_____
J. Cox

United States Bankruptcy Judge

## EXHIBIT A

### Budget

*[See attached.]*

6309773v11 12/19/2014 3:45 PM                                               1989.405

6309773v11 12/19/2014 3:45 PM                                               1989.405

6309773v11 12/19/2014 3:45 PM                                               1989.405

# Cash Collateral Budget

'(000's)

| | | Full Week / Actual | Actual | | Payroll | | Payroll | | Payroll | | Payroll | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 12/5<br>Total Wk 1 | 12/12<br>Total Wk 2 | 12/19<br>Total Wk 3 | 12/26<br>Total Wk 4 | 1/2<br>Total Wk 5 | 1/9<br>Total Wk 6 | 1/16<br>Total Wk 7 | 1/23<br>Total Wk 8 | 1/30<br>Total Wk 9 | 2/6<br>Total Wk 10 | 2/13<br>Total Wk 11 |
| **Cash Disbursements:** | Assumptions: | | | | | | | | | | | |
| NetSuite (NS) ERP license $11,653 qrtrly | 12/14 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NS Website sandbox lic. $2,331 qrtrly | 12/14; removed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent - Ravenswood ($9,330) | 1st | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent - Schiller Park whse ($8,525) | 1st | 0 | 8 | 9 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 9 |
| Rent - Schiller Park office ($4,933 beg. Jan 1) | 1st | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
| Rent - Schiller Park office ($6,500 sec. dep.) | 1st | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BCBS Medical Insurance | 1st | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 0 | 13 | 15 |
| Wells Fargo ABL LOC interest & banking fees | 1st | 0 | 2 | 0 | 2 | 13 | 0 | 2 | 0 | 0 | 0 | 0 |
| Utilities, Phone, Internet, Trash, Pest Control $4K/mo | 1st | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| Oper Leases – Forklift & Copier (Wells) | 1st | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Office Phone & Internet $1.5K | 1st | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Business Insurance $42K pd monthly | EOM | 0 | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 0 |
| Broker commission fees - avg $17K | EOM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Prof Svc - Marketing $8K | EOM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Recall Insurance $20K pd monthly | ACH 18th | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| D&O - EPL Insurance $12K pd monthly | paid thru 7/2015 | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| Acctg Review $23K (No) & Tax Returns $20K (TBD) | April 15th | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payroll, Temps, Taxes & 401K Match | bi-wkly 11/28 | 0 | 71 | 0 | 64 | 0 | 58 | 0 | 58 | 0 | 58 | 0 |
| Accrued PTO to be paid-out | one-time 12/26 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trade Shows - N/A | N/A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wells Fargo Adequate Protection Payment | One-Time | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IT, SEO, EDI Fees, Email, ERP Consultant & Phone Con | Periodic | 0 | 0 | 50 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Employee Expenses, Office Supplies, Sales/Use Tax | Weekly | 0 | 0 | 12 | 5 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Federal Express & LTL Carriers | Weekly | 0 | 20 | 20 | 24 | 12 | 10 | 12 | 12 | 10 | 10 | 10 |
| Inventory & Co-Packers | Weekly | 0 | 0 | 10 | 73 | 8 | 72 | 75 | 76 | 78 | 81 | 81 |
| Corrugated, Packaging, Postage, Office Supplies, R&M | Weekly | 0 | 137 | 87 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| Administrative & Legal Expenses | Beg. 12/22 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 25 | 25 | 25 | 25 |

### Summary of Cash & Sales:

| | 12/5<br>Total Wk 1 | 12/12<br>Total Wk 2 | 12/19<br>Total Wk 3 | 12/26<br>Total Wk 4 | 1/2<br>Total Wk 5 | 1/9<br>Total Wk 6 | 1/16<br>Total Wk 7 | 1/23<br>Total Wk 8 | 1/30<br>Total Wk 9 | 2/6<br>Total Wk 10 | 2/13<br>Total Wk 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Receipts (collections) | 137 | 316 | 359 | 85 | 89 | 76 | 100 | 122 | 140 | 155 | 169 |
| Less Cash Disbursements | 0 | (233) | (208) | (184) | (148) | (187) | (102) | (185) | (129) | (199) | (163) |
| Cash Surplus (Deficit) - Period to Date | 137 | 83 | 150 | (99) | (59) | (111) | (2) | (63) | 11 | (45) | 5 |
| Cash Surplus (Deficit) - Life to Date | 137 | 220 | 371 | 272 | 213 | 101 | 99 | 37 | 47 | 3 | 8 |
| | | | | | | | | | | | |
| MA Carve-Out | 0 | 0 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| | | | | | | | | | | | |
| Accounts Receivable ending balance | 1,244 | 905 | 512 | 535 | 453 | 601 | 732 | 838 | 929 | 1,013 | 1,081 |
| Inventory ending balance | 2,668 | 2,629 | 2,625 | 2,562 | 2,654 | 2,624 | 2,586 | 2,551 | 2,518 | 2,478 | 2,515 |
| Gross Sales | 109 | 63 | 100 | 125 | 26 | 239 | 251 | 252 | 258 | 270 | 270 |
| Credit Memos & Cash Discounts | (38) | (85) | (134) | (17) | (18) | (15) | (20) | (24) | (28) | (31) | (34) |